UNITED STATES, Appellee

v.

STANLEY WILLIAMS, Private First Class, U. S. Army, Appellant

4 USCMA 69, 15 CMR 69

No. 3088

Decided March 26, 1954

George W. Cashman, Esq., Lt. Col James C. Hamilton, U. S. Army, and 1st Lt Paul Berger, U. S. Army, for Appellant.

Lt Col William R. Ward, U. S. Army, for Appellee.

## Opinion of the Court

Paul W. Brosman, Judge:

A general court-martial found the accused guilty under a specification alleging that he had violated the Uniform Code of Military Justice by sleeping upon his post as a sentinel. Article 113, 50 USC § 707. Following this finding and a consideration of accused's two prior convictions, the court sentenced him to receive a dishonorable discharge, to total forfeitures, and to confinement at hard labor for ten years. The findings and sentence were approved by the convening authority and affirmed by a board of review. We granted the accused's petition to determine whether the evidence sufficed to support the conviction, and if prejudicial error had occurred in connection with the sentence.

### II

The evidence adduced at the trial revealed that on September 17, 1952, the accused's platoon was located on the main line of resistance in Korea. At 8:00 pm he began a tour of duty as a sentinel, and was stationed alone in a forward bunker. A "sound power telephone" connected him with his platoon. The platoon guide, a Sergeant Klavas, testified that at about 9:00 o'clock he sought unsuccessfully to communicate with the accused by telephone, and "kept calling him continuously" for approximately thirty minutes. Then Klavas crossed the fifty yards or so between himself and the accused's post.

Since it was quite a dark night, he created a certain amount of disturbance in stumbling before arrival at the bunker. There the Sergeant found the accused "crouching in the corner." "I stayed watching him and then I butted him with a rifle and asked him if he was asleep and he said 'no' that he was not sleeping but was scratching," Klavas detailed. Later he demonstrated to the court that the accused was seated with his knees raised, his head resting thereon, his hands between his legs, the phone in his left hand. The accused's M-1 rifle was placed on a ledge near his right shoulder. The enemy was also located on accused's right. Klavas stood watching the accused for perhaps a minute—yet the latter made no movement and breathed heavily. Asked "Did he say anything when you poked him?", Klavas replied, "No, sir. I poked him and he raised up and I asked him if he was sleeping and he said no, that he was scratching."

Although Sergeant Klavas testified that the accused had failed to challenge him as he neared the post, he conceded that such action would not normally be forthcoming, provided the sentinel recognized the person approaching. Klavas admitted too that, because of darkness, he could not observe the accused's face. When asked on cross-examination, "Can you state that you actually know, and you still are under oath, whether he was sleeping or not?",

**71**

Klavas answered, "No, sir." Interestingly enough, the defense counsel had previously objected successfully to testimony from this same witness to the effect that "it seemed to me that he was asleep," on the ground that Klavas should not be permitted to express an opinion on the question of whether the accused was asleep.

The accused took the stand to present his version of the transaction. According to him, after he went on post at eight o'clock: "Sergeant Klavas kept calling me every twenty to twenty-five minutes and then I didn't hear from him and I paid it no mind and then later I saw a flicker from the candle in the bunker of the CP and I could see him coming. He approached my position and I was positive it was Sergeant Klavas and when he came up I didn't say nothing." The accused explained that he offered no challenge because he "didn't want to make any unnecessary noise." He added that Sergeant Klavas "stood there about forty seconds and I bent over to scratch myself and he stepped down into the bunker and jabbed me in the ribs with his rifle." He elaborated, "I had the phone in my left hand and I had an irritation and I bent over to scratch it and then Sergeant Klavas hit me in the ribs with a rifle." When reminded on cross-examination that Klavas had testified that he did not move, the accused stated, "I moved down like this." Unfortunately, the record fails to describe the demonstration which presumably accompanied this testimony.

The accused was retained on his post until somewhat past midnight, and stated that, with some effort, he was able to receive over the power telephone during the remainder of his tour. However, he also stated that "somewhere there was a loose connection" in the phone—although he acknowledged that when first he went on post it had "worked all right." Sergeant Klavas indicated that he had checked the instrument at some time subsequent to the accused's alleged dereliction and had found it to be in good working condition. One Private Neal testified that the sound power telephone "was working as far as I know" when he relieved the accused shortly after twelve o'clock. Without objection, Neal also related hearsay to the effect that men in another squad, previously occupying the bunker in which the accused was posted, mentioned having had trouble with the phone. However, no witness, other than the accused, testified that he had experienced difficulty with the sound power telephone in question.

### III

Government counsel, in an extensive brief, have assailed this Court for applying an elusive standard in the determination of sufficiency of evidence as a matter of law. They accuse us—it appears—of impinging on the court-martial's right and power to appraise the credibility of witnesses and to weigh evidence. While we are indeed seeking to utilize a uniform standard as to sufficiency, we acknowledge—nay urge—that, in this area of law, generalizations tend to be vain. We believe that we have made this point explicitly on numerous occasions. Nor do we seek to constitute of ourselves super-triers of fact. Rather our concern is wholly with the presence in the record of a quantum of evidence which would convince reasonable men of the exclusion of every hypothesis of innocence. Obversely stated, the proposition is to the effect that evidence is insufficient to sustain a finding of guilt if all reasonable minds would agree that the evidence did not destroy every rational hypothesis of innocence.

We recognize that an area exists within which reasonable men may differ on the inferences to be drawn from particular evidence. However, we also conceive that there exists a field encompassing conclusions which no reasonable mind could draw from a given set of circumstances. Moreover, in passing on sufficiency—and fully recognizing that the court-martial is charged with the evaluation of testimonial credit—we believe it required that we consider *all* of the evidence in the record, and not merely that which is adduced by the prosecution. It seems established in military law that instances will occur

where the evidence presented by the defense will be such that reasonable men simply cannot disbelieve it. See Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, pages 168, 211. It is, therefore, no encroachment on a court-martial's authority and responsibility to forbid a disregard of evidence—from whatever source forthcoming—which no reasonable person could disbelieve.

## IV

Examining the evidence in the case at bar within the context of the propositions set forth, we have determined that the issue of sufficiency must be resolved against the accused. Admittedly, to sustain the finding ▮▮▮▮▮▮ requires reliance on circumstantial evidence; yet that a conviction properly may be predicated on such evidence is beyond controversy. Thacker v. United States, 155 F2d 901 (CA5th Cir); Manual for Courts-Martial, United States, 1951, paragraph 138b. We observe that whether a man is asleep is ▮▮▮▮▮▮ a less subjective fact than, say, his intent or purpose at a particular moment. Yet similar difficulties of proof are encountered, and in many instances—as here—a concatenation of circumstances must be relied on by the prosecution. In this connection, Colonel Winthrop, discussing proof of the crime of sleeping on post, has pointed out:

". . . That he [the sentinel] was actually asleep may be shown by some such fact or facts as the following, viz.—that accused, (if the offense occurred, as it usually does, in the night,) failed to challenge the officer or party approaching his post; that he was found lying down, or in a position favorable to sleep, instead of standing or walking his beat; that he was snoring or breathing as if in sleep; that he did not answer when spoken to, once or repeatedly; that he did not apparently become conscious till touched, shaken, &c; that when roused he was stupid; that he had dropped or laid aside his musket, or that he allowed it to be taken from him without resistance, &c." [Military Law and Precedents, 2d ed, 1920 Reprint, page 616.]

Utilizing Winthrop's suggestions, we note that the accused failed to challenge Sergeant Klavas when the latter approached the outpost. The accused's explanation that he had recognized Klavas, and therefore that he did not challenge him, was not inherently improbable—although the court may have wondered how it came about that, on an extremely dark night, the accused was able to recognize his visitor so readily as he testified he had done. So far as we can gather from the record, the accused was in a position favorable to sleep, and was breathing heavily. He failed to respond to calls by telephone during some thirty minutes following 9:00 p.m. According to the accused, his phone was not in good operating condition. Yet he admitted that it was in sound order when he went on post. Moreover, it was functioning subsequently, according to both Klavas and Neal. The unverified hearsay testimony —which came from Neal—to the effect that unidentified persons had mentioned difficulties with the equipment earlier, did not at all destroy the basis for the permissible inference that a phone which had behaved properly shortly before 9:30 p.m., and again shortly thereafter, must have been in the same efficient condition at exactly 9:30. Manual for Courts-Martial, supra, paragraph 138a. Significant also is the failure of the accused to speak to Klavas during the period—described by the accused himself as of some forty seconds duration—while the Sergeant stood watching him. Indeed, no sign of consciousness seems to have been visible to the onlooker until he had prodded the accused with his rifle.

Defense counsel insist that the intelligible reply by accused to the question, "Are you asleep?", revealed clearly that he could not have been sleeping when approached by Klavas. This contention stems from an assumption that the question and the prodding were simultaneous. However, we have concluded that Sergeant Klavas' testimony, earlier recounted, is amenable to the reasonable construction that an interval elapsed between his shaking accused

with the rifle butt and the inquiry if the latter was asleep. This interpretation of the testimony, being rationally probable, must be adopted in determining whether to impeach the court-martial's finding for insufficiency. Haupt v. United States, 330 US 631, 91 L ed 1145, 67 S Ct 874. The accused explained his crouched position—in a manner indicative of perfect performance as a sentinel—by saying that he suffered from a skin irritation, and that he had slumped to massage himself. According to his own testimony, this action took place following Klavas' arrival. Since Klavas testified that he detected no motion whatever on accused's part, the court-martial was called on to elect between two not entirely harmonious accounts of the same events. Clearly they did not choose to believe the accused's story—which was in no wise testimony which reasonable men would be bound to accept.

Great emphasis is placed by the accused on Sergeant Klavas' failure to assert that he "actually knew" that the accused was unconscious. Yet this portion of the testimony is not, we feel, a proper cynosure. The occurrence of sleep in another is often difficult to determine with precision. Occasionally one even encounters difficulty in determining at exactly what point—or indeed *if*—he himself had dropped into a state of slumber. In light of the serious difficulty—and frequent impossibility—of mathematical certainty in this area, we attach little *significance* to a witness' inability, or understandable unwillingness, to assert definitely that he "actually knows" that another is asleep. A conscientious witness is frequently reluctant to express too conclusive an opinion on a matter which is inherently incapable of perfect proof. We refuse to say that this reluctance effectively negates testimony as to objective manifestations of the condition in question. We would not feel called upon, for example, to reverse a conviction of an offense requiring proof of drunkenness for the sole reason that no prosecution witness would say emphatically that he "actually knew" that the accused was drunk. Consequently, this hesitation on Klavas' part does not

in any way operate to dissuade us from our opinion that the evidence presented to the court-martial sufficed to uphold the findings of guilt.

V

Although not normally a persuasive legal authority, Shakespeare has described sleep as that which █ "knits up the ravell'd sleave of care." Perhaps in passing we may characterize the term "sleep" for purposes of prosecutions under Article 113. As we conceive it, successfully to prosecute for sleeping on post does not require a showing beyond reasonable doubt that the accused was in a wholly comatose condition. Many persons are light sleepers who seldom, if ever, fall into that deep state. Instead, we believe that the standard to be applied is roughly analogous to that which might be utilized for purposes of prosecution for drunkenness on post. All that is required by way of evidence in the case at bar, we believe, is the showing of a condition of insentience which is sufficient sensibly to impair the full exercise of the mental and physical faculties of the sentinel. In framing Article 113, the draftsmen of the Code were, in our view, seeking to assure—through the imposition of penal sanctions—the alert and rational performance of duty as a sentinel. Other lives are at stake in this situation much too frequently to permit the adoption of other than the most rigorous standards of enforcement of this duty. Of course, it must not be understood from the foregoing that we are adopting for this offense a standard found this side of sleep. Certainly the accused must be asleep in some proper meaning of the term—and this requirement is not met by a mere dulling of the perceptions through, say, physical exhaustion not amounting to slumber.

VI

Defense counsel have presented still another argument pointing toward insufficiency. They look to portions of Sergeant Klavas' testimony █ which indicate that, when he arrived at the accused's bunker, the latter was crouched in such

74

a position as to block his own view of the enemy—with the result that he could not properly perform his duties as a sentinel. Accordingly, the defense sees fit to invoke the reasoning of an Army board of review utilized in United States v. Whiteman [CM 353636], 4 CMR 388. There the board determined that, when the accused had departed his guard station for the bunker adjoining it, he had in fact left his post, and thus could not be tried for sleeping thereon—this for the reason that he had fallen asleep only after his arrival at the second bunker. Without pausing to determine whether we can assent to the rather technical view expressed by the board in that case, we decline to apply such a distinction in the instant case. If the accused was found sleeping in the bunker—established here to have been in size "about eight by ten [feet] square"—on which he was originally posted, he is, for any purpose of interest to us, sleeping on post. We are quite unwilling to subdivide the bunker into segments, as the defense appears to desire, and to say that in one section the accused is on post, whereas, if he falls asleep in a different one, he may only be tried for leaving his post, but not for sleeping thereon. Such hairsplitting appears to us to be of modest profit. Indeed, so far as we are concerned, the accused, ostrich-like, may have interred himself beneath the bunker preparatory to slumber. In our view, he would be on post—and, if asleep, chargeable with sleeping thereon.

## VII

The charge against the accused was referred for trial as a noncapital case. In light of the suspension ▮▮▮▮▮▮ ▮ by Executive Order of the Table of Maximum Punishments as to certain offenses committed during hostilities in the Far East, the accused's conviction for a violation of Article 113 would have permitted the imposition of a death sentence, in the absence of a contrary direction from the convening authority. United States v. Bancroft, 3 USCMA 3, 11 CMR 3. The law officer read Article 113 to the court, and thereafter informed its members that the Table of Maximum Punishments had been suspended. Since he did not inform them that the case was to be treated as noncapital by reason of the instructions of the convening authority, the court-martial quite probably deliberated on sentence with the misconception that a death sentence might lawfully be imposed. However, this misconception—generated by the incomplete instructions of the law officer—was specifically noted by the staff judge advocate in his review of the case. That same review stated in a terminal portion that the sentence as adjudged by the court was "correct in law and fact and is appropriate for the offense of which the accused is charged." Considering this affirmation as to appropriateness, together with the recognition by the staff judge advocate of the law officer's error, we are constrained to say that the possible prejudice accruing to accused from the law officer's incomplete instruction on sentence had been cured. United States v. Crusoe, 3 USCMA 793, 14 CMR 211.

From what has been said, it follows that the action of the board of review must be affirmed.

Chief Judge QUINN concurs.

LATIMER, Judge (concurring in the result):

In concur in the result.

I would concur outright if it were not for the fact that I believe the record more eloquently supports the findings than does the Court's opinion and that this makes unnecessary any discussion concerning the standards to be used in determining the state of sleep. The factual structure of the case is such that the court-martial had to find that the accused was either sound asleep or he was awake relieving his irritation. The court-martial rejected the latter version, so we need only concern ourselves with the evidence to support the former.

The record would permit any reasonable person to find that the accused was one of seven men left to man outpost positions, while the balance of the platoon was to go forward on a raid. There were two men assigned to each position and the accused's tour of duty was from 8:00 p.m. until 12:30 a.m.

**75**

He was required to keep a sound power telephone in his hand or to affix it in such a manner that it would not be more than twelve inches from his ear. The telephone was in working order when he took over his assignment and for an hour thereafter, as he was called by the sergeant several times between 8:00 and 9:00 p.m. It was functioning immediately after the sergeant aroused the accused at 9:30 p.m.; it was in service condition from then until after midnight; and, it was operating when the accused was relieved at 12:30 a.m. by another member of the guard. The sergeant attempted to reach the accused by telephone commencing at 9:00 p.m. and continued his attempts until 9:30 p.m., but he received no answer. He thereupon left his post to determine the reason.

The duties of the accused required him to be alert, maintain a constant lookout for possible enemies, report any unusual incident, and challenge anyone who approached the position. The night was dark, and visibility was restricted; the sergeant covered approximately fifty yards in approaching the post and as he proceeded into the bunker, he created some disturbance. Accused neither challenged nor spoke to the sergeant. The sergeant looked into the bunker, noticed the accused sitting down with his head slumped between his legs, faced at right angles to the enemy avenue of approach, breathing deeply, but otherwise motionless and with the telephone in his hand. His weapon was lying on a ledge to his right. The sergeant entered the bunker close to the accused and watched him for at least a minute. After observing him for that period of time, he was so impressed with the fact that the accused was asleep that he jabbed him in the ribs with the butt of his rifle to awaken him. While he did not relieve the accused at that time, because all other members of the platoon were being used, he called him every fifteen minutes to make certain the performance was not repeated.

Under the issues of this case, it matters not whether the accused was a light or heavy sleeper. Either he was awake and occupied in relieving an irritation of his body or he was sleeping so soundly that possibilities of danger, attention to duty, repeated telephone calls, noises of an approaching person, the immediate presence of an unexpected visitor in close quarters, and a poke in the side with the butt of a rifle were necessary to bring him back from slumberland. Those facts leave no doubt in my mind that the finding is amply supported by the record.