UNITED STATES, Appellee

v

JAMES P. JACKSON, Private, U. S. Army, Appellant

7 USCMA 67, 21 CMR 193

No. 7307

Decided May 18, 1956

*First Lieutenant Philip L. Evans* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel James M. Scott*.

*First Lieutenant Robert L. Taylor* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton, Lieutenant Colonel Robert M. Murray*, and *First Lieutenant William K. Davenport*.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

Following his trial by general court-martial, the accused was convicted of willful disobedience of his superior officer, in violation of Article 90, Uniform Code of Military Justice, 50 USC § 684. He was sentenced to dishonorable discharge, total forfeitures, and confinement for one year. The convening authority reduced the confinement to six months, suspended the punitive discharge and provided for its remission after one year, and otherwise approved. A board of review in the Department of the Army affirmed, and the accused comes before us on the sole issue of the sufficiency of the evidence to sustain the verdict.

At about 9:30 p.m., on November 27, 1954, in Ojoji-hara, Honshu, Japan, the accused and Private First Class White had occasion to report a beer hall disturbance to the military police. As witnesses to what appears to have been a "bar room brawl," they were transported back to their company orderly room, together with a Sergeant Sutton —who apparently was involved as a participant. Thereafter, the accused cooperated with Lieutenant Larkin, the Executive Officer, and the military police in the investigation which was conducted. He was sober, quiet, did not seem upset in any way, and referred to Lieutenant Larkin as "Lieutenant" or "Sir" at all times.

After the investigation was completed, the accused was excused by the Executive Officer to return to his billet, and left the orderly room. Within a few minutes, a scream was heard to emanate from the billet area. Lieutenant Larkin, accompanied by two non-commissioned officers, ran out of the

orderly room toward the billet area and intercepted the accused, who was proceeding in the opposite direction with his hands up to his face. It was the officer's considered judgment that the accused was not weeping and was not hysterical. When Larkin asked what had happened, the accused, who seemed upset, replied that he had been "jumped." Larkin lowered the accused's hands from his face, and, having observed neither blood nor other sign of injury, requested further explanation. Jackson again replied that he had been "jumped," uttered an oath, voiced a threat to kill his assailant, pushed Larkin aside, turned, drew a knife from his pocket, and began to run toward the billets. Lieutenant Larkin followed in hot pursuit, meanwhile calling upon the accused to stop and put down the knife. After a chase of some twenty to thirty yards, the accused stopped, pivoted, and swung at the officer with knife hand extended. The Lieutenant then knocked him to the ground with his flashlight, and terminated the affair.

Although darkness had set in, the area was illuminated by the headlights of two vehicles and several flashlights, and enough light was provided to permit Larkin to see the knife held by the accused at a distance of six to eight steps. The Lieutenant was attired in fatigues, including his insignia of rank, and had served with the unit for almost three months. The accused, who had been with the organization for about a year, normally worked in the motor pool. Lieutenant Larkin saw him daily and spoke with him at least two or three times a week. Jackson did not address Lieutenant Larkin by name or grade after leaving the orderly room, and his reputation as a peaceful, law-abiding person was excellent.

## II

It is a familiar principle of military law that one of the distinguishing features of the offense ▪ presently before us is the defiance of the superior-subordinate relationship. Appellate defense counsel rely heavily on that premise and argue that the evidence estab-

lishes only that the accused "did not have sufficient command of his faculties to form the specific intent required for the commission of the charged offense, to recognize Lieutenant Larkin as a superior officer and to appreciate the relationship existing between them." We do not accept that contention as an accurate characterization of the record before us, but the argument is sufficiently weighty to require a development of the reasons which cause us to disagree with the assertion.

One who commits the offense of willful disobedience must have knowledge that the person issuing the ▪ order is his superior officer, ▪ United States v Simmons, 1 USCMA 691, 5 CMR 119, and counsel for the accused contend there was no substantial proof of recognition in this case. We are willing to assume the fact finders could have found that the accused was emotionally disturbed to the point of being "out of his head," in the words of witness Greene, or that illumination was so poor at the time as to preclude identification, and, therefore, that he did not recognize Lieutenant Larkin at the time when the order was given. But on the other hand, there are many evidentiary items and circumstances which support the finding made. Full and fair instructions on the issue of knowledge were given by the law officer, and the court-martial resolved the issue against the accused. We are sure its choice should not be disturbed.

In support of the finding, it is important to note that the claimed mental confusion on the part of the accused arose out of an alleged assault, yet the record is devoid of any evidence to corroborate his story of having been attacked. Although he seemed upset when he was intercepted by Larkin, he was not weeping or hysterical; he was mentally competent to understand the full import of the questions asked by Lieutenant Larkin for he replied in an intelligent, responsive, and positive manner to the questions; and no visible marks to indicate that he had been the victim of violence were found, then or ever. The company area was lighted by truck headlights; Larkin and the

accused were facing each other; the Lieutenant was close enough to take appellant's hands from in front of his face and see his features distinctly; the officer was attired in a uniform bearing indicia of his rank; other witnesses, some distance removed from the participants, were able to identify them without supplementing the illumination in the area; Larkin was able to see the blade of accused's knife at a distance of six to eight paces; and several witnesses were able to see the accused reach in his pocket and obtain a knife. Furthermore, Larkin shouted his demands in a voice loud enough to be heard and identified by others, and the accused undoubtedly recognized the Lieutenant's voice, for the two men were far from being strangers to one another.

## III

It is no more difficult to find evidence of willfulness than it is to find evidence of knowledge in this record. ■ However, there is no direct testimony as to accused's mental state and so the findings must be sustained only if the circumstantial evidence will support them. We suppose that if the court-martial had believed one particular witness, it could have found that the act of disobedience was not willful because of a mental disturbance. But the members were not required to accept any one witness' explanation, and, from the record as a whole, a reasonable man could well have determined that the act of the accused in pushing the Lieutenant away, pulling his knife, attempting to use it on the officer, and running away while being ordered to stop and give up the weapon, established an intentional defiance of authority. United States v Vansant, 3 USCMA 30, 11 CMR 30. We believe a court-martial member could fairly conclude that the accused was intent upon getting even with his alleged assailant, and when it appeared his plan was being frustrated by the Lieutenant, he decided to disregard the orders of his superior officer and carry out his vengeance even if it required him to use a knife to prevent interference. A reasonable fact finder could regard it as significant that the accused did not turn toward the officer with the knife until it became clear that he was slowly but surely losing the foot race. Sometimes the spontaneous acts of participants speak louder than their words, and the defiance exhibited by the accused was such that the Lieutenant was forcefully impressed with a belief that he had to disable the accused to avoid serious injury.

As a final argument to escape affirmance, appellate defense counsel contend that the record furnishes ■ evidence that the accused obeyed the order to halt, and that this was the reason why he stopped and turned to face his pursuer. The argument runs that accused ceased running either out of a desire to assault Lieutenant Larkin, or because he recognized the tenor and source of the order and intended to comply. It is said that the first alternative concerning the assault is disposed of by the trial forum's finding that the accused was not guilty of drawing a knife against his superior officer, an offense which was also before them at the time they retired to deliberate.

With respect to that theory, the law in the Federal system is that consistency in the verdict is not necessary. Each count in an indictment is regarded as a separate indictment, and a finding of not guilty on one cannot be pleaded as res judicata of the other. Dunn v United States, 284 US 390, 393, 52 S Ct 189, 76 L ed 356, 358, 359 (1932); United States v Sicley, 6 USCMA 402, 20 CMR 118. Under the facts shown in this record, the court-martial could well have found the accused guilty on all specifications. Because the court preferred to free him on one specification alleging a more serious offense does not also mean it found that one particular element of a less aggravated offense was not established. Perhaps the court-martial preferred not to return a finding of guilt on an offense which traditionally has been regarded as a most heinous military crime. It is an acknowledged fact that verdicts are sometimes founded on leniency, compromise, or mistake, and if the accused is the beneficiary of compassion or

error, he is not in a position to complain.

The decision of the board of review is affirmed.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

The accused was charged with drawing a weapon against his superior officer and willful disobedience of an order by the same superior officer, "to halt, stop, and surrender a knife in his possession," in violation of Article 90, Uniform Code of Military Justice, 50 USC § 684. He was acquitted of the former but convicted of the latter offense except the words "surrender a knife in his possession."

The accused and Private White reported a beer hall disturbance to the military police. Afterward, for the purpose of investigating the disturbance, they, in company with a Sergeant Sutton, were transported back to the company orderly room. Sergeant Sutton, drunk and belligerent, was ordered to his barracks by Lieutenant Larkin, the Company Executive Officer. Thereafter, the accused, who had remained quiet and cooperative, received permission from Lieutenant Larkin to retire to his barracks. Before leaving, he addressed Larkin as "Lieutenant" and "Sir." Shortly after the accused left, a scream emanated from the billet area. Lieutenant Larkin, Sergeant Greene, and Corporal Guier went "on the double" in that direction. They saw the accused running toward the orderly room with his hands over his face. According to Sergeant Greene, the accused was crying, and from all appearances, he was "extremely excited." Although the night was dark, the headlights of two jeeps and a number of flashlights illuminated the area. Larkin approached the accused. His testimony as to what transpired is as follows:

". . . I ran toward Jackson, who had his hands up to his face and said 'Jackson, what's the matter' and he said 'They jumped me' and I said 'Who jumped you' and he said 'They jumped me, I'll kill the . . .' and I said 'Who, Jackson? What's the matter?' and I lowered his hands from his face and there was no damage, no blood or sign of any injury, and I said 'Jackson, what's the matter? Stay calm and let me find out what this is about.' and Jackson then pushed me aside, turned to his right, reached into his left hand pocket and withdrew an object."

The accused dashed off in the direction of the billets with Larkin in close pursuit. Lieutenant Larkin further testified that:

". . . When he approached the line of the troop billets, within a yard and a half, I continued yelling to him to stop, put down the knife, don't go any further, Jackson turned to the right and in his left hand was the knife. He stopped immediately, but his momentum carried him momentarily further and he made a motion at me with his arm extended, and the knife left his hand.

. . . . .

"His momentum carried him on around to the right as he turned and passed me . . . I hit him in the back of the head with the flashlight. . . ."

In all, Lieutenant Larkin pursued the accused twenty to thirty yards. He could "very easily" have overtaken Jackson but he tried "by voice to make Jackson listen" to him. At no time did he identify himself as an officer and he had no idea whether the accused understood him. He was wearing fatigues, which displayed his insignia and rank; however, the accused gave no indication of recognition nor did he say "sir" or "Lieutenant Larkin." Under the circumstances, Lieutenant Larkin "couldn't say" whether or not the accused understood his shouts to "stop, put down that knife, don't go any further, stop." Larkin testified that as best he recalled the accused was not crying when he was first stopped. However, he admitted that he was "excited" and that he spoke to accused for "just the time it took to speak about four sentences . . . and lower his hands in front of his face." He also thought it was "unusual" for a man to run with his hands in front of his face. Further questioned

about the accused's emotional state, he testified as follows:

"Q. Did you have any significant reaction as to whether he knew what he was doing, or what was your reason for telling him to calm down?

"A. That was the most important thing—I had to have some semblance of his being calm, so I could question him and he could answer questions.

"Q. Did you feel that he was at all psychologically prepared to receive an order to stop when you gave it?

"A. I had no other choice but to give the order.

"DC. But you don't know whether he even knew he was given an order?

"A. I cannot say."

Sergeant Greene gave evidence that:

"A. Private Jackson broke loose from Lieutenant Larkin—he ran around Lieutenant Larkin and went beyond him, and he told him to stop—he just said 'Stop' about two times.

. . . . . .

"A. And when Jackson slowed down almost to a stop, he came around with his arm . . . I don't know whether he was coming through or swinging at him, because at that point Lieutenant Larkin hit him with the flashlight.

"Q. Did you see anything in Jackson's hand?

"A. No, sir.

. . . . . .

"Q. What were the lighting conditions in this area at the time of this incident. . . .

"A. The lighting conditions there—it was poor, very poor."

In the sergeant's opinion, the pursuit covered approximately 15 yards and lasted three to four seconds. Moreover, he was convinced that the accused was "out of his head."

Corporal Guier testified that the night was dark and his recollection of the events was:

". . . Jackson swung around and was running towards the billeting tents and he [Lieutenant Larkin] caught up with him again, and I was still more or less running in the general direction where it happened

. . . I saw him slapping Jackson's hands and say to drop it, to drop it, and then Jackson was on the ground."

Guier did not notice a knife in the accused's hands.

Private Gale was walking guard when he heard a "terrifying scream." He ran in that direction and, although only a short distance away, arrived upon the scene as Lieutenant Larkin was chasing Jackson. He was not aware of a knife in the accused's hand, and at no time did he see Jackson make a motion to strike Lieutenant Larkin.

The problem in this case is whether the evidence to the effect that the accused recognized Lieutenant Larkin as his superior officer, and willfully disobeyed him, excludes every reasonable hypothesis of innocence. This Court has held that the evidence is insufficient "to sustain a finding of guilt if all reasonable minds would agree that the evidence did not destroy every rational hypothesis of innocence." United States v Williams, 4 USCMA 69, 15 CMR 69. Put differently, the evidence is insufficient to sustain the verdict if, as a matter of law, reasonable minds agree that a rational hypothesis other than guilt can be drawn from the evidence. United States v O'Neal, 1 USCMA 138, 2 CMR 44; Leslie v United States, 43 F2d 288, 289 (CA10th Cir) (1930); Stoppelli v United States, 183 F2d 391, 393 (CA9th Cir) (1950). Applying these principles to the instant case, I conclude that the finding of guilty and the sentence should be set aside for reasons of insufficiency.

Implicit in willful disobedience of a superior's order is the accused's knowledge that the order did in fact emanate from a superior officer. The interim, from the scream until the incident was closed by Lieutenant Larkin's flashlight, lasted approximately forty-five seconds. The night was dark, the accused was crying, greatly agitated, and, in Sergeant Greene's testimony, "out of his head." By his own admission, Larkin was unable to elicit one coherent statement from the petitioner; his (Larkin's) words "made no impression."

The fact that the accused previously knew Lieutenant Larkin does not require an inference that he recognized his superior officer under the unusual circumstances of this incident. As Larkin approached, the accused not only was emotionally upset, but he also had his face covered with his hands. Coincidentally, when his hands were lowered by Larkin, the accused sprinted away. Furthermore, only a second or so elapsed during the interval from Larkin's arrival until Jackson pushed from him and began to run. Larkin testified that he had only the "time it took to speak about four sentences to Jackson and lower his hands from in front of his face."

Aside from the question of recognition, the facts of this case do not establish a willful defiance of authority. A violation of Article 90, Uniform Code of Military Justice, 50 USC § 684, presupposes disobedience in a positive and deliberate manner; a conscious intent to disregard a superior's orders, and not disobedience prompted by hysteria or heedlessness. A conscious and rational mental operation is required, or there is no intentional act. "The willful disobedience contemplated is such as shows an intentional defiance of authority." Paragraph 169b. Manual for Courts-Martial, United States, 1951.

According to Sergeant Greene, only three to four seconds elapsed during Lieutenant Larkin's chase of the petitioner. At most, it could not have lasted over five seconds. It is logical to assume that some time after Jackson broke away and began to run, the order was given to stop. According to the witnesses, after travelling fifteen to twenty yards, he turned to the right and actually stopped or markedly slowed down. Considering all the facts in this case, a delay of three or four seconds in obeying an order does not amount to disobedience, much less willful disobedience. This is apparent if we direct our attention to the probable reason the accused altered his flight. Either he did so out of a desire to assault Larkin, who appeared to be hampering the commission of his objective; or despite the confusion, he still recognized an order to stop. The majority make much out of the accused's possession of a knife. They even maintain that the accused attempted to use it on the officer. However, the trial court found the accused not guilty of raising a knife against his superior officer; it also found him not guilty of the charge that he wilfully disobeyed the order to "surrender a knife in his possession." That would seem to dispose of the first alternative. Nevertheless, the Government argues that we disregard the trial court's finding, and conclude that the accused did intend to assault Larkin, in making a determination as to willful disobedience. Contrary to the majority's conclusion, I believe that contention can be supported only upon the basis of conjecture, speculation, and suspicion. United States v Shull, 1 USCMA 177, 2 CMR 83. It flies in the face of the court-martial's specific findings.

Turning to the second reason, namely, that the accused understood an order to stop had been given, but nevertheless refused to obey it. Carefully considering all the facts concerning this matter, I cannot say, as a matter of law, that the evidence of willful disobedience of Lieutenant Larkin's order establishes the accused's guilt beyond a reasonable doubt. In accordance with our decision in United States v Peterson, 1 USCMA 317, 3 CMR 51, within the fair operation of reasonable minds, the evidence in this case is as consistent with innocence as it is with guilt. I would reverse the findings of guilty and dismiss the charge.