UNITED STATES, Appellee

v

LUTHER B. LYON, Master Sergeant, U. S. Air Force, Appellant

15 USCMA 307, 35 CMR 279

No. 18,123

April 2, 1965

*Lieutenant Colonel Andrew S. Horton* argued the cause for Appellant, Accused. With him on the brief was *Colonel Robert O. Rollman.*

*Major Thomas J. Connolly* argued the cause for Appellee, United States. With him on the brief was *Colonel Emanuel Lewis.*

## Opinion of the Court

FERGUSON, Judge:

This is a strange case. It becomes more perplexing as the pages of the transcript unfold a drama in which the alleged "victim" is painted as an adulterer, while the accused appears to have been an injured husband of previously impeccable reputation, whose long and honorable service in the United States Air Force has earned the merited praise of his superiors. Taking action on the record, the convening authority apparently realized that the storm in which accused had become enmeshed was no more than a stirring of tea leaves and suspended all of the adjudged sentence except a reduction of one grade. It remains to be seen whether he also acted properly in affirming a conviction of attempted extortion, in violation of Uniform Code of Military Justice, Article 127, 10 USC § 927, for that is the delict of which the accused was found guilty and on which the court-martial based a punishment of bad-conduct discharge, confinement at hard labor for eight months, and reduction to the grade of airman basic. It is also worthy of note that the court acquitted him of robbery, in violation of Code, supra, Article 122, 10 USC § 922, and another count of extortion.

The findings of guilty and sentence having been affirmed by the board of review, the accused sought relief here, and we granted his timely petition upon the issues:

308

"1. Whether the law officer erred prejudicially in refusing to allow the defense to impeach Sergeant Williams in regard to alleged prior relations with the wife of the accused (R. 74), as being in accord with the defense theory, or as part of the defense case without regard to impeachment.

"2. Whether the law officer erred to the prejudice of the accused in failing to submit the defense theory of the case to the court with properly tailored instructions."

In order to place these matters in proper perspective, we set out the evidence surrounding the alleged occurrences.

I

Two versions of the incident charged are shown in the record. According to testimony of Staff Sergeant James Williams, the matter came about in the following manner.

While at the Base Noncommissioned Officers' Club, Minot Air Force Base, North Dakota, during the evening hours of August 17, 1963, accused invited Williams to join him at his table. Mrs. Lyon was also present. Accused had been drinking, and at Mrs. Lyon's invitation, Williams accompanied them to their quarters. There, he drank a beer, and Lyon, indicating that he was going to bed, walked out of the room. Williams was also intoxicated and declared that the next thing which he remembered was being awakened by Sergeant Lyon in Mrs. Lyon's bedroom. At the time he was nude and in bed with Mrs. Lyon, who was clad only in "some garment . . . a negligee or housecoat or ———." To the best of Williams' knowledge, he had not engaged in intercourse with Mrs. Lyon. However, he had been alone with her in the accused's quarters before; he had twice gone with her to Deering, North Dakota, on social excursions; he had "parked" out in the country with her; and he had "petted her." He had also informed her "I thought a lot of her" but had not indicated any desire to marry her. In addition, he had given her a locket, two high fidelity speakers, and she "got a dia-mond ring of mine," worth approximately six hundred dollars.

Sergeant Lyon, armed with a .45 caliber automatic pistol, ordered Williams out of Mrs. Lyon's bed and "told me to get dressed, get my clothes and go downstairs." Williams complied, and followed Lyon down to the living room. There, Lyon, still holding the pistol, told Williams, " 'This is going to cost you,' " and asked him how much money he could obtain. Williams replied that he did not know, declaring he only had thirty-seven dollars with him. Accused stated, " 'I'll take that,' " and did so. He then told Williams "it would cost me five hundred dollars and he said I owed him the balance of four hundred and sixty-three dollars." He gave Williams one week in which to raise the remaining sum, and presented him with a .45 caliber cartridge " 'as a reminder.' " The victim was then allowed to depart from Lyon's quarters through the rear door.

According to Williams, he saw the accused again "approximately a week or ten days later outside of the Base Commissary." When Lyon reminded him of his "debt," Williams replied that he did not have the money. Accused told him to go to the Credit Union and borrow it. Williams agreed to do so that afternoon. At 2:05 p. m., the accused picked him up at the Commissary but did not drive him to the Credit Union, as planned. Instead the parties proceeded to a bank in Minot, North Dakota, where Lyon obtained a blank note. "He filled it out, made it payable to himself, with a due date on it, and told me to sign it." Williams complied, and accused drove him back to the base.

On September 14, Lyon and Williams met at the Noncommissioned Officers' Club to settle the "debt." Williams testified he paid Lyon four hundred and twenty dollars in travelers' checks and forty-three dollars in cash. Lyon, however, refused to give him a receipt and did not return the note which Williams had executed. Subsequently, on October 21, 1963, accused called Williams on the telephone and "said I'd been harassing his wife

about a ring that she had in her possession of mine, said he still had the note and I was going to pay it again. I told him no, that I'd already paid that note and he says you're going to pay it again." Lyon then declared that "he would just have to take it to Colonel Brown, my commanding officer."

Williams declared he had given the accused the original sum of thirty-seven dollars in cash because "He had a weapon pointed at me, I was scared." He executed the note later, as he was still afraid and he did not wish the incident to become known.

Williams specifically denied he had promised to pay the accused the sum of one thousand dollars in order that he might obtain a divorce from Mrs. Lyon. He had, however, in the past been involved in another incident in which he had offered to pay off a husband's debts for household furniture in connection with the wife obtaining a divorce.

Finally, Williams conceded that, following the above occurrences, he became involved with Lyon at the NCO Club in another incident and attempted to assault him with a beer bottle.

Lieutenant Colonel Brown testified that he was Sergeant Williams' Commanding Officer. On October 22, 1963, accused informed him Williams owed him $463.00 and had refused to pay it. He had been advised by a local attorney to see Brown, as the debtor's commanding officer, in an effort to collect. When Brown inquired as to the circumstances, accused advised him what had occurred and "I got the impression there was an agreement made between them, a certain sum of money would be paid and nothing would be said." Colonel Brown delayed any action until he had heard Sergeant Williams' version of the incident. According to Williams, he was called in and informed the Colonel that he had paid the note previously.

The prosecution also introduced into evidence a properly obtained oral pretrial statement in which accused related that he had discovered Sergeant Williams in bed with his wife and,

having armed himself, caused Williams to leave the bedroom. "They went downstairs where Sergeant Williams gave him thirty-seven dollars" and "promised to pay him a thousand dollars if he kept quiet . . . actually begging him." Later, Williams gave him five hundred dollars in travelers' checks, and executed a promissory note for the balance due. Also received in evidence was certain property obtained from accused's quarters during a lawful search conducted in November 1963. This included the diamond ring which Williams had earlier presented to Mrs. Lyon.

Mrs. Mary Lyon appeared as a witness for the defense. She testified she had been married to the accused for approximately ten years and had borne him three children. While working in the Base Commissary, she became romantically involved with Sergeant Williams. On objection by the trial counsel, she was not permitted to testify as to whether Williams had engaged in intercourse with her on several occasions on which he visited the family quarters in the absence of the accused.

On the evening in question, Williams accompanied the Lyons to their home. Sergeant Lyon "fell asleep . . . or passed out or something," and the others took advantage of the opportunity to engage in the sexual act. She could not recall the details of how this came to pass, but "Sergeant Williams and I were past the stage where we had to talk it over." Mrs. Lyon fell asleep herself, and was awakened when she heard the accused come into the bedroom. She could not say what happened thereafter for it was "just like it was a dream."

Mrs. Lyon and Sergeant Williams "were planning to be married," and, as tokens thereof, he had earlier given her the diamond ring and a locket. Williams also desired that she retain custody of accused's children and control over the Lyon's household goods. Williams continued his protestations of love and affection up until the accused found them together. Since that night, she had continued to live with her husband "because of my children,

not as a married couple." She had engaged in intercourse with Williams because "I think I was in love with the man, . . . [and] I don't know that I'm still not."

Against this background, accused elected to testify in his own behalf. He declared that he and his wife were joined by Sergeant Williams at the Noncommissioned Officers' Club. Williams immediately began ordering drinks for everyone, and for the balance of their stay at the Club, "no one else at the table bought any." Accused commented on the unusual strength of the beverages purchased for him, and Williams "laughed this off." Mrs. Lyon quit drinking, and "shoved her drinks over in front of me." During this entire period, Williams limited his alcoholic consumption to one or two beers. Accused became intoxicated, and Williams accompanied him and his wife to the Lyon's quarters, in order "to see me home." Outside the quarters, accused became ill, and Sergeant Williams entered the house with them. While Williams and Mrs. Lyon were drinking coffee, accused either "went to sleep or passed out." When he awoke, the house was dark, and he started up the steps to bed. On the way, he heard groans and, fearing his wife was ill, entered the bedroom and switched on the lights. He found Sergeant Williams actively engaged in sexual intercourse with Mrs. Lyon, and told him to leave the house. When Williams did not respond, accused returned downstairs, armed himself with a pistol, and came back to the bedroom. He found Williams dressing and again told him to leave. Williams accompanied him downstairs, and accused told him some day he would be shot for such behavior. Williams then informed accused he loved Mrs. Lyon, wished to marry her, and wanted the accused to divorce her. When accused remonstrated with him, Williams replied that he would pay for the divorce, compensating the accused in the amount of $1,000.00. He laid $37.00 in cash on a coffee table in the living room, and told accused he would " 'pay . . . the rest of the thousand dollars later.' "

Accused replied that he did not wish the money and once more told Williams to leave. The amorous sergeant then departed.

Several days later, Williams once more contacted accused, and told him " 'We want a divorce, I'm going to pay you.' " Thereafter, the parties met at Williams' insistence, and proceeded to a downtown bank. Williams executed a note in the amount of $463.00, and agreed that he would give the accused $500.00 in cash when he returned from a projected leave.

Sometime thereafter, accused met Williams in the Noncommissioned Officers' Club and, when Williams attempted to pay him the five hundred dollars, refused at first to accept it, telling him that he only wished Williams to leave his family alone. Williams, however, continued to argue; pointed out the divorce was, in any event, inevitable; and pushed the sum due in accused's pocket. Thereafter, Williams called accused several times, inquiring about when divorce proceedings would be instituted. Accused finally determined to end his marriage and consulted two attorneys. As he could not afford to institute proceedings without collecting the Williams note he determined to do so, and was advised by his lawyer to consult Williams' commander, Lieutenant Colonel Brown. Such consultation led eventually to the charges and record now before us.

II

The sole count of which accused was convicted alleges he sought to extort $463.00 from Sergeant Williams by falsely reporting to Lieutenant Colonel Brown that Williams was indebted to him in that amount; by exhibiting Williams' note to Colonel Brown in support of such report; and by claiming that Williams had wrongfully and dishonorably failed to satisfy such indebtedness. The law officer instructed the court with respect to the elements of this offense, and couched his advice in the language alleged in the specification. Beyond this, however, he did not go, except to add instructions not relevant to the questions

**311**

presented and the mandatory advice required by the terms of Code, supra, Article 51, 10 USC § 851.

### III

The first issue before us inquires into the propriety of the law officer's refusal to allow Mrs. Lyon to testify concerning her prior relations with Sergeant Williams on the basis of the trial counsel's objection that such would constitute collateral inquiry into Sergeant Williams' denial of such acts during his earlier cross-examination. We are satisfied that, under the peculiar circumstances here presented, the ruling was erroneous.

True it is that, as the Government argues, it is normally impermissible to contradict a witness' denial of other acts of misconduct by extrinsic testimony, that is, by means other than cross-examination of the witness. United States v Robertson, 14 USCMA 328, 34 CMR 108; McKune v United States, 296 Fed 480 (CA 9th Cir) (1924); Manual for Courts-Martial, United States, 1951, paragraph 153b. But contradiction for the purpose of impeachment alone is to be distinguished from proof of other acts of misconduct in connection with the merits of the controversy presented to the court-martial. If such misconduct be relevant and material, it is provable directly and quite without regard to whether the persons involved therein deny its commission. Manual, supra, paragraph 138g; United States v Robertson, supra; United States v Villasenor, 6 USCMA 3, 19 CMR 129. It is the latter situation which this record presents, for the whole position of the defense was that Williams had become enamored of Mrs. Lyon; found his affection reciprocated, as evidenced by a long-standing illicit relationship with her; and, upon the violent revelation of this fact to the accused, sought to have him divorce Mrs. Lyon in order that his own union with her might be legitimated—offering in the bargain to pay the sum of $1,000.00 in order to defray the expenses of the necessary legal proceedings. The law officer, therefore, erred in ruling to the contrary. Whether the error presents a fair risk of prejudice to Sergeant Lyon on this record need not be considered in light of our disposition of the case.

### IV

The second issue before us concerns itself with the law officer's instructions. As noted above, he did no more in this connection than to state the elements of the offenses charged in terms of the language alleged in the specifications and add the mandatory instructions on the burden of proof. Although there were clearly defined theories on the part of the prosecution and defense, he made no attempt to crystallize the effect of either for the benefit of the fact finders. Thus, while the entire defense position was that Williams desired the accused to divorce his wife and proffered him the sum of one thousand dollars to defray the expenses thereof—$537.00 ultimately delivered in cash and the balance represented by a promissory note—the law officer made no attempt to inform the court members that, if such facts caused it to entertain a reasonable doubt concerning Sergeant Williams' version of the incident, then it must acquit the accused. Yet, we have repeatedly pointed out the duty of the law officer to make an "affirmative submission of the respective theories, both of the Government and of the accused on trial, to the triers of fact, with lucid guideposts, to the end that they may knowledgeably apply the law to the facts as they find them" and that the absence of such submission may, in a proper case, lead to a failure to "avoid the possible pitfalls that . . . attend instructing on barren and abstract legal principles in a vacuum." United States v Smith, 13 USCMA 471, 474, 33 CMR 3, 7. See also United States v Moore, 15 USCMA 187, 35 CMR 159.

That such pitfalls were left open to entrap the members during their deliberations in this trial is not open to doubt. The essence of the Government's charge was that the accused, in order to extort payment of the note,

twice threatened to and did in fact falsely accuse Sergeant Williams of dishonorable failure to pay an indebtedness, a criminal offense in violation of Code, supra, Article 134, 10 USC § 934. United States v Cummins, 9 USCMA 669, 26 CMR 449. The accused, as we have stated, made out his case on the proposition that the debt was just, due, and owing him. But the law officer at no time pointed out the effect of the evidence, if believed, on the accused's criminal liability. In short, he failed fairly to explain that if the debt in fact existed, as accused alleged, his efforts to utilize well-recognized and legal means to enforce its collection would not amount, in law, to the offense charged. In brief, as we have said in another connection, the court members "were left to pilot themselves willy-nilly between the broad abstract statements of the law which he did provide and, uninformed as to the effect of the various versions of the incident, reach their own, untutored conclusion." United States v Moore, supra, at page 198.

Indeed, the findings of the court-martial are, in light of the evidence, disturbingly suggestive of a compromise verdict. As presented by the principal protagonist, the accused should have been convicted as charged or entirely exonerated. According to Williams' testimony, he gave the accused money primarily because he was "scared" of him and, secondly, because he did not want to have his career affected by disclosure of the incident. He flatly denied he ever offered or paid the accused any money for a divorce. Oppositely, the accused testified that Williams said he would pay $1,000.00 to enable him to get a divorce from his wife. The court-martial could, of course, reject Williams' testimony and find, as it did concerning the first two offenses, that he was not coerced into paying any money to the accused, but voluntarily elected to defray the accused's divorce expenses. It could have rejected the accused's testimony that Williams agreed to pay $1,000.00 and convicted him of all the charges. Nothing in the evidence, however, justifies a finding that Williams agreed to pay $500.00, and after he paid it the accused demanded he pay again. Yet, that was the theory argued by trial counsel.

An inconsistent verdict is not usually a cause for relief. See United States v Jackson, 7 USCMA 67, 21 CMR 193; United States v Phillips, 14 USCMA 620, 34 CMR 400. The reason for the rule is that the court-martial may merely have given the accused "a break." Here, however, trial counsel's argument, on a theory not based upon the evidence, could have been adopted by the court-martial. The accused should not bear the burden of that risk. See Giant Food Stores, Inc. v Fine, 269 F2d 542 (CA DC Cir) (1959). The law officer should have instructed the court-martial that the theory posited by trial counsel had no support in the evidence. Cf. United States v Adams, 5 USCMA 563, 18 CMR 187.

And, under the circumstances of this case, we must also deem this failure so to submit the issues to the fact finders to be prejudicial. United States v Tanner, 14 USCMA 447, 34 CMR 227; United States v Moore, supra. The case is an extremely close one on the evidence, and turned almost entirely upon which version of the incident the court chose to believe. Left unguided as to the interrelationship between the proof and the legal principles involved, there is more than a fair risk they might have come to another conclusion, had the matter been submitted correctly. More is not required, in order to show harm to accused's substantial rights.

Having determined that reversal is necessary, we ordinarily would order a rehearing on the charge. The Code, however, vests this Court with the discretion to dismiss the charges in lieu of such action. Code, supra, Article 67, 10 USC § 867. While such is an authority to be sparingly exercised, it would appear that all factors present here weigh in favor of its use. Thus, we note that all of accused's sentence, as approved and suspended

by the convening authority, now stands remitted, with the exception of a reduction in grade. Possible imposition of such a minor penalty, viewed in light of accused's long and honorable service in the past, the nature of the evidence presented, and the other circumstances here, convince us that causing him to suffer through the harassment of a rehearing is not justified. We, therefore, intending to establish no precedent for such action in other cases, conclude the ends of justice to all will be met by putting an end to this prosecution.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Air Force. The Charge and specification of which accused was found guilty are ordered dismissed.

Chief Judge QUINN and Judge KILDAY concur.