UNITED STATES, Appellee

v

WALTER T. FERGUSON, Private First Class, U. S. Army, Appellant

21 USCMA 200, 44 CMR 254

No. 24,349

February 25, 1972

*Captain Libero Marinelli, Jr.,* argued the cause for Appellant, Accused.

With him on the brief were *Colonel George J. McCartin, Jr.,* and *Bernard J. Casey, Esquire.*

*Captain Ronald A. Cimino* argued the cause for Appellee, United States. With him on the brief were *Colonel David T. Bryant, Lieutenant Colonel Ronald M. Holdaway,* and *Captain Walter A. Smith, III.*

## Opinion of the Court

DARDEN, Chief Judge:

Charged with felony murder and robbery, Private First Class Ferguson was acquitted of the former but was found guilty of the robbery, with the court apparently being uninfluenced by his having pleaded guilty to larceny—the lesser included offense. We granted review to determine whether the robbery conviction is supported by the evidence.

Since the appellant's plea admits the wrongful taking of money from the person of Sergeant Johnson with intent to permanently deprive, we must survey the evidence to determine whether the taking was by force or violence, an indispensable component of the offense. If the record includes competent evidence from which the members of the court-martial could find beyond a reasonable doubt the existence of this element, the conviction is sustainable. United States v Papenheim, 19 USCMA 203, 41 CMR 203 (1970). With this guideline in mind, we turn to the record.

After assignment to the transportation school at Fort Eustis, Virginia, on temporary duty from Fort Polk, Louisiana, the victim, Sergeant Johnson, indicated he had not been paid for some time and needed cash. He was paid a transportation allowance of $65.10 the next day.

That night two bartenders at the non-commissioned officers' club served him many drinks. When Sergeant Johnson appeared to be drunk, the master-at-arms was notified, and he ordered that service to Johnson be ended. A short time later the master-at-arms asked Johnson to accompany him out of the bar area because he was apparently annoying another club patron. Without objection, but held by both shoulders, Johnson stiffly walked into the adjoining vestibule. After a taxi was called he walked outside unaided. This taxi did not arrive and the master-at-arms spoke to the driver of another, who agreed to drive Johnson home.

Outside the club entrance, Johnson was clinging to a pole supporting the canopy. His incoherence frustrated attempts to find out his address or organization. As the master-at-arms turned to leave, Johnson fell flat on his back, face up. The force of the fall did not appear great and he did not seem to be hurt. He suffered no noticeable mark of injury. He simply grimaced and rubbed his head. The cab driver then unsuccessfully attempted to lift him up and to have him grasp the pole again. The master-at-arms finally helped Johnson to lean back against the club wall.

Inside the club, someone commented to the doorman, Sergeant Montgomery, that in his condition Johnson was vulnerable to robbery. The appellant responded that he would get Johnson if " 'someone would move him from in front of the club.' " Sergeant Montgomery volunteered. At about the same time the night manager of the club ordered Johnson moved. Montgomery and another person moved him from the front of the club to a nearby "TV bar" entrance. Appellant Ferguson walked in this same direction inside the club. Outside the TV bar entrance he was seen alone with Johnson holding him around the waist. Johnson, though drunk, was "dragging himself." He looked as if he had been "smacked" on the side of his head. A witness thought this appearance was caused by a bruise or by Johnson's having rested his head on Ferguson's shoulder.

About 11:00 p.m., Specialist Gates emerged from the club and walked to-

ward the rear parking lot. As he drew close to this area of trees and bushes he heard a shout and saw Johnson with the appellant. Johnson was in a prone position with half his body on the sidewalk. Gates and Ferguson attempted to place him in a sitting position, but he was so limp they were unsuccessful. He opened his eyes and mumbled, however. Ferguson rejected Gates's offer to drive Johnson home, saying that he would call a cab. As Gates drove away he saw Ferguson walking alone toward the club.

At 11:25 p.m., Sergeant Walker was approached by a person who asked for the phone number of the military police station in order that he could report having seen a soldier lying behind the club. Walker was then taken to where Johnson lay. His right leg worked back and forth, and his head "probably" turned. When a light slap on the face and a bend of the fingers brought no significant response, Walker returned to the club and called the military police.

Military police arrived and immediately checked to determine whether Johnson still had his billfold. They found some other items on the ground. His pockets were turned inside out. Johnson continued to move his right leg and left hand. A quarter-size abrasion described as a "scrape more or less" was on his left forehead. Fluid that looked like blood was on his nose.

Johnson was taken by ambulance to McDonald Army Hospital and then transferred to the Portsmouth Naval Hospital, where he was examined and operated on by the Chief of Neurosurgery. This physician testified that skull X-rays and an arteriogram revealed a 5-inch skull fracture over a blood clot that put pressure on the brain. Surgery removed the clot, but Johnson died on the operating table. The surgeon testified of his opinion that to sustain the type of injury the victim had he would have had to fall on the top of his head or to hit a vertical surface with "some force" with his head in a down position. According to the surgeon, a person would not incur such an injury from an ordinary fall.

A state medical examiner who performed an autopsy testified to the same effect. He found a superficial abrasion over the left side of the face and over the nose area but no evidence of any injury to the back of the head. In his opinion, the head damage that caused death could not have resulted from a fall on level ground unless the victim had fallen on the top of his head from some height. In addition to this injury, the deceased had suffered from a "blunt injury" that brought about massive hemorrhaging in the neck structure. The medical examiner thought that this damage could have been caused by a fist, karate-type chop, a choking by a forearm, but not by a fall.

Following his examination of the X-rays and arteriogram mentioned above, another doctor testified for the defense that the deceased's fatal head injury could have come from the fall on his back.

In a pretrial statement, the appellant stated that he and Montgomery walked Johnson from the TV bar entrance to the rear of the club. At that point Johnson broke free but stumbled and fell on his face. Ferguson picked up the mumbling Johnson, laid him on his back in a grassy area, and then rifled his pockets. After this he returned to the noncommissioned officers' club. Ferguson denied hitting the victim with fist, arm, or hand.

The essence of appellate defense counsel's argument is that when a victim is so drunk he cannot resist, application of the kind of force required to constitute robbery is impossible. In their view, the evidence must show either that force was applied to overcome a will against yielding possession or that the victim was rendered unconscious to make the theft possible.

A not guilty verdict of felony murder in this case obviously reflects the court-martial's belief that the evidence was insufficient to prove beyond a reasonable doubt that Ferguson inflicted the head injury that caused Johnson's death. Regardless, in military law, as in the Federal system generally, con-

202

sistency of verdicts is not demanded. United States v Jackson, 7 USCMA 67, 21 CMR 193 (1956). The court-martial's finding as to this offense is therefore not *res judicata* to robbery.

The record contains other evidence important to the robbery charge. Johnson was conscious when he ■■■■■■■■■ was escorted to the rear of the noncommissioned officers' club. The military jury could have considered the "dragging" as a sign of resistance rather than the involuntary reaction of a drunk; the appellant concedes that Johnson had the consciousness to escape the grasp of those causing his movement at this time.

Even more persuasive perhaps was the neck injury the victim suffered. Expert testimony that this injury would not have resulted from a fall tends to prove that the neck injury and the head injury had separate causes.

The military jury had before it evidence that Johnson had a physical injury that was not the cause of his death and that was not incurred when he fell. They also considered evidence that a not unconscious victim was involuntarily moved from the front of the club to the rear. We cannot say that reasonable persons could not have been convinced beyond a reasonable doubt that force was applied to a conscious victim to accomplish the taking.

We affirm the decision of the Court of Military Review.

Judges QUINN and DUNCAN concur.