UNITED STATES, Appellee

v

ROBERT T. MOORE, Airman Third Class, U. S. Air Force, Appellant

15 USCMA 187, 35 CMR 159

No. 17,869

December 24, 1964

*Major Milton E. Kosa* argued the cause for Appellant, Accused. With him on the brief was *Colonel Robert O. Rollman.*

*Major Thomas J. Connally* argued the cause for Appellee, United States. With him on the brief was *Colonel Emanuel Lewis.*

## Opinion of the Court

FERGUSON, Judge:

Faced with conflicting versions of how the death of Airman Third Class Marvin E. Howard occurred, a general court-martial convened at Grand Forks Air Force Base, North Dakota, found the accused guilty of unpremeditated murder, in violation of Uniform Code of Military Justice, Article 118, 10 USC § 918, as lesser included in the original charge of a premeditated slaying, and sentenced him to dishonorable discharge, forfeiture of all pay and allowances, confinement at hard labor for twenty-five years, and reduction to Airman Basic. The convening authority approved the sentence. The board of review, while reducing the period of confinement to twenty years, found accused "in no position to complain of any deficiencies in 'tailoring' the instructions on self defense" as that matter was not in issue at the trial. Accordingly, it affirmed. We granted Airman Moore's petition for review of the board's decision upon the following issues:

"1. Whether the law officer erred in refusing the requested instructions on self-defense (R. 252).

"2. Whether the board of review erred in holding that self-defense was not in issue."

Resolution of these matters necessarily involves an examination of the evidence adduced at the trial. Accordingly, we turn to the record in order to recount the circumstances surrounding this tragic incident.

I

On paydays, gambling customarily took place in Room 136 of the airmen's barracks at Grand Forks Air Force Base. The room was the residence of the deceased, Airman Howard, better known to his fellows as "Red Hoss,"

188

and three other airmen. Accused, who lived elsewhere, occasionally joined in games of chance in the room, and knew Red Hoss quite well, although they were not "tight." July 31, 1963, was no different from any other payday, and a fairly large number of airmen, including Red Hoss and the accused, gathered in Room 136 at approximately 2:30 p.m., to try their luck.

Accused, Red Hoss, and several other airmen participated in a dice game. According to Airmen Roberts and Redd, Red Hoss became impatient with the slow and deliberate manner with which accused threw the dice. He told the accused either to gamble or leave the room; arose, went over to his bed, "reached in his shirt pocket and pulled out this razor and he told Moore, he said 'if you ain't gonna gamble, get your — — — out of my room or I'll kill you.'" Moore replied, " 'I'm leaving,'" picked up his money, and walked out of the room. Red Hoss, Redd, and several other airmen later went to Room 218, where gambling was also in progress. There, they shot dice for awhile, and a poker game started between Howard, Redd, Airman Junior, and Airman Daniels. After a few hours of play, the accused entered. Howard was either sitting at the poker table with his back to the wall or on the bed. Accused asked Howard, " 'Do you still have that razor you pulled on me?'" and Howard replied, " 'Yes, I still got it.'" Everyone moved away from the table, and Howard "pulled this razor out." When he "opened the razor up it looked like he was sort of ready to advance. At this time, Moore seen the razor and he pulled out this gun, and as soon as this started, I hadn't taken no more than two steps backing up, it happened in about two seconds, he fired the gun." Accused backed up to the doorway of the room, told the others not to move as " 'he might have a friend in here,'" announced that, " 'I ain't no psycho, I know what I'm doing,'" and said he was going to turn himself in and call the hospital. He then allowed Airman Roberts to seek medical assistance, and was "twirling the gun around in his hand, cowboy fashion."

After being shot, Red Hoss slung the razor out of his hand, and accused approached him, stating he was sorry that he had shot him, " 'but you just shouldn't have pulled that razor on me.'" The missile struck Red Hoss in the left center portion of his chest, piercing the aorta, and causing his death in the late evening hours of the same day.

Several airman testified that accused spent considerable time seeking a weapon after his enforced departure from Room 136. Airman Henry declared accused entered his room during the early evening hours and asked to borrow a gun or, if not, whether he knew where one might be purchased. He informed Henry Red Hoss had "pulled" a razor on him. Airman Turner joined the conversation. Eventually, the trio proceeded to Turner's room and examined two weapons which he possessed, a .38 caliber revolver and a .22 caliber revolver. Turner had no ammunition for the more powerful handgun, and "Airman Moore said that was okay because he didn't need any, he didn't want any." The parties could not agree on a price for the .38 caliber pistol and then discussed the sale of the .22 pistol. Turner sold the pistol to accused and informed him he might as well also take the ammunition which he had for it, as he would no longer need it. Moore might have told Airman Henry he wanted the gun for protection.

Airman Turner testified accused purchased a .22 caliber revolver from him for $11.00 and he gave him ammunition for it as they were leaving the barracks. Moore did not appear anxious to buy the weapon, and stated that he wanted it "to go out rabbit hunting or target practice." Turner could not recall if lack of ammunition for the other pistol was the subject of comment by Moore, but he still attempted to purchase it at a lower price after learning Turner had no cartridges for it.

Airmen Kuhach and Bouknight indicated accused initially stated he wanted the pistol to shoot someone, but smilingly retracted this declaration and said he wished to shoot rabbits.

Accused informed an Airman Evans, at approximately 9:30 p.m., that Red Hoss had earlier ejected him from Room 136 with a razor and, in order to learn why, he was going to talk with Howard. Evans cautioned him not to get into trouble, and accused replied that he merely intended to discuss the matter.

Several witnesses testified to the deceased's reputation for violence and that he was a bully. Other witnesses related various incidents which indicated Howard possessed an extremely bad reputation for being quarrelsome, dangerous, and violent. The victim himself had frequently expressed the view that he had been so difficult in his relations with others he would not live to be twenty-five. On the other hand, accused was known as a peaceful individual, whose chief fault appeared to be his addiction to alcohol, for which he was awaiting administrative discharge.

In a properly obtained pretrial statement, accused related that he had known Howard for several months, and there had been bad feeling between them because of a prior incident. On the date in question, they were getting along well together until the gambling started. Howard wanted the accused to bet against him in the dice game and, when accused refused, ran him out of the room with a razor. At first accused was frightened. Afterwards, he became angry, and decided to purchase a pistol with which to protect himself. He obtained a weapon, sought out Howard in Room 218, entered, and asked "why he was always giving me a hard time." Thereafter,

" . . . Howard jumped up and pulled his razor out. I took the gun out of my pocket and without saying anything, I shot him, firing one shot and he fell on the bed. Howard then said, 'Man, you didn't have to shoot me', and I said I thought you were going to cut me. I then told the airmen in the room to call a doctor and left the room and walked down the hall."

Accused elected to testify in his own behalf. According to his version of the events, he and Red Hoss left the Air Base in the early afternoon and drove to Emerado, North Dakota, in order to purchase liquor. They returned, and commenced gambling in Room 136. On the trip back to the Base, Red Hoss became argumentative over the accused's refusal to allow another airman to drink from his bottle and his giving another individual a cigarette after Howard had refused to do so.

In the dice game, accused bet against Red Hoss. When Red Hoss lost, he became profane, produced his razor, and ordered the accused out of his room. As he reached the door, Red Hoss declared, " 'I'm gonna cut your whatchamacallit throat if I ever see you again.' " Moore left the building and just "started thinking about why did he jump on me like that for no reason at all so I just started walking and thinking." Accused was not angry. He was "mostly worried," for "just about every place we go we run into each other." And "if I ran into him I thought he would cut me or something else." He thought about getting a "big butcher knife" down at the mess hall where he worked, for then "I could go up there and show him and I could talk to him. I could talk like a man and get everything straightened out. . . . Well sir, if he seen the knife, he probably wouldn't be jumping up to cut me."

Accused then determined that arming himself with a knife would not be sufficient as Howard "might just go ahead and try me anyway and one of us would get cut or both of us would get cut, and whatever the outcome was, there would be a lot of trouble about it, so I thought about getting a gun." He then obtained the .22 caliber pistol from Airman Turner in order that he would be adequately armed when he spoke with Howard. "I figured if I got the gun I could go up there and talk to him and if he goes for his razor or something I could pull it out and hold him off until we talked, get everything straight." He did not purchase the larger caliber pistol, as he considered it too expensive:

"Well sir, to tell you the truth, I didn't want to spend that much money on a gun right then, because the way I figured it, I could give him $25.00

**190**

and go up and talk to Red Hoss and show him that I had a gun and that I was gonna keep a gun, and then whenever I leave, a few days before I was discharged, I could get most of my money back and give him back his gun, it was almost like a loan, sir."

Accused loaded the gun, because he felt that Red Hoss might still try to attack him, and he wished to be in a position to fire a warning shot in order to stop him. He expressly declared that he never had any intention of shooting his victim. Upon entering the room he stated to Howard, " 'I want to talk to you about that razor you pulled on me today.' " When Red Hoss moved his hands down, accused went for his gun. He shot without aiming, and his victim was so close to the accused, the latter thought he would be cut with the razor—in fact, that he was "already cut."

Accused conceded there had been bad blood between him and Red Hoss since they first met, describing the situation as involving "kind of strained relations." Accused considered himself a good shot, but things happened so quickly in the encounter that he was unable merely to wound his assailant. Red Hoss' reputation, in the accused's eyes, was that of a "meanster," or a "badster." The parties were approximately the same size, but the accused knew nothing of his victim's physical capabilities, declaring, "All I ever heard of him was razor whipping somebody or like that."

Airman Robinson, appearing for the defense, declared that, just before the shooting, Red Hoss replied to accused's inquiry concerning the razor by saying, " 'Yeah ———, I still got it, and I'll cut your ——— ——— throat.' " Howard was actually in motion, prepared to strike at the accused, when the latter produced the pistol from his pocket and shot.

## II

As noted above, the board of review found the foregoing evidence did not place self-defense in issue, concluding that:

"In our view, the issue of self-defense hinges on whether the accused was the aggressor (US v Green, 13 USCMA 545, 33 CMR 77). The evidence here points to the conclusion that accused did not kill the victim because he believed it necessary to avoid death or great bodily harm, but was bent on putting an end to a situation whereby Howard had become his anathema. No issue of self-defense was raised, and the accused was not entitled to an instruction on self-defense. . . ."

Undoubtedly, under one view of the evidence, the board of review might permissibly reach the conclusion which it did. Nevertheless, in order to do so, it is necessary to disregard other evidence in the case—particularly the testimony of the accused and those in support of him—which indicates that he sought out Red Hoss not for the purpose of lethally "putting an end to a situation whereby Howard had become his anathema" but in order to compose their differences so that he would not, as Howard had allegedly threatened, have his "whatchamacallit throat" cut when next they met. Moreover, it overlooks the accused's declaration he armed himself for self-protection in the event that, intent as he was upon securing peace for the duration of his stay in the Air Force, he was nevertheless met with a deadly assault. And it is undeniable that, whatever accused's credibility may be, he was in fact confronted with an immediate and violent reaction to his entry into the room in the form of the production of a straight razor which, as many of the witnesses noted, was brandished against him in a threatening manner. And accused claims that it was only on the production of this weapon that he drew his own and fired the fatal shot. Finally, it is certainly not without significance that another witness declared Red Hoss' reply to accused's question was a swift and positive statement that he would cut accused's throat, coupled with the initial motion necessary to accomplish this objective. In short, the record presents alternative versions of the entire incident, and it was not open to the board of review

**191**

perform the function of the trial court and select that to which it was willing to accord credibility on appeal. Cf. United States v Singletary, 14 USCMA 146, 33 CMR 358; United States v Kuefler, 14 USCMA 136, 33 CMR 348.

Both the board of review and Government counsel at this level apparently attach controlling significance to our decision in United States v Green, 13 USCMA 545, 33 CMR 77, in finding no issue of self-defense presented in this record. In that case, however, a majority of the Court found the accused "did not indicate that, upon reasonable grounds, he feared imminent death or serious injury at Gray's hands," nor did he arm himself for that reason. United States v Green, supra, at page 549. It was pointed out that, while accused's victim in that case was armed with a carbine when the encounter began, "[s]ignificantly, no claim is made Gray made any use whatever" of the weapon. Id., at page 549. Finally, it was concluded by the Court the record presented no alternative to the finding that the accused, following an initial encounter with his victim, became angered, deliberately armed himself, and returned vengefully to seek retaliation by engaging in combat with his adversary in which he would enjoy the advantage of a deadly weapon at the expense of his unarmed victim. In short, the Court could find but one version of the incident in *Green,* supra, whereas in the instant case, two entirely distinct possibilities are presented.

Reference need only be made to the foregoing recital of the evidence to point out that accused declared his purpose in again seeking out Howard was in order to settle their differences and avoid further difficulty and injury to himself in encounters which would necessarily occur prior to his departure from the Base. Unlike the situation in *Green,* supra, Howard was alleged to have informed Moore in emphatic terms that he would cut his throat when he next saw him. Again, whereas Green's victim made no attempt to use a weapon upon his eventual assailant's appearance, Moore's inquiry concerning the

razor was met with its instant production, allegedly coupled with both the declaration that the earlier threat would be immediately carried into execution and actions designed to accomplish that end. We, therefore, have no hesitancy in rejecting the argument that this case is to be controlled by our earlier decision on other facts in United States v Green, supra.

Turning to positive inquiry into the effect of the evidence here presented, the nub of the question is whether a defendant is deprived of the right to claim self-defense when, following a violent encounter with his eventual victim, he arms himself and deliberately seeks out the individual again, the weapon being taken along for the possible protection of himself and his purpose allegedly being conciliatory. It seems well settled that, under such circumstances, the accused does not become an aggressor and that testimony of such tenor places self-defense in issue.

In State v Bristol, 53 Wyo 304, 84 P2d 757 (1938), a quarrel erupted in a liquor dispensary between the defendant and one Skogerson, with Skogerson being ejected for his misconduct. He then returned and apologized to a bartender but verbally abused the defendant and threatened to " 'stomp his face in' " when defendant left the store. Skogerson then proceeded to a cafe across the street. Defendant armed himself and proceeded cautiously to the cafe, where he met another individual. They walked toward the washroom, passing a booth in which Skogerson and others were sitting. Defendant allegedly glared at Skogerson, who immediately arose and commenced a violent assault upon him. Defendant drew his pistol and shot Skogerson. In declaring that self-defense was placed in issue, Chief Justice Blume declared:

" . . . When defendant went to the restaurant, he could be seen. He testified that he did not intend to go to the place where the deceased was, and if his testimony is true, no particular blame can be laid at his door. But the jury evidently disregarded that testimony. The State thinks

192

that he should have gone home, instead of going to the restaurant. The jury doubtless took that view, and it is not improbable that the fact that he did not go home was the most potent factor in convicting the defendant. And, ethically speaking, that, perhaps, is what he should have done. Without saying what the true facts are in this case, it *is* true that standing upon one's rights is not always the best course. The predicament in which the defendant finds himself today is good evidence thereof. Many times it pays and pays in solid rewards to follow the advice of Buddha when he urged: 'Let a man overcome anger by love; let him overcome evil by good,' or to follow the advice of Christ when he exhorted: 'Resist not him that is evil, but whosoever smiteth thee upon thy right cheek, turn to him the other also.' But we have not arrived at such happy age. The difficulties in the way of reaching such end seem to be more herculean than the labors of Hercules. The restaurant was a public place. It was in itself not an unlawful or wrongful act for the defendant to go there. If it was wrongful, it was made so because the deceased had made wrongful and unlawful threats. The mind recoils from drawing such illogical conclusion. Logic, of course, must give way at times to the larger interests of ethics and public policy, and if the latter clearly required the defendant to avoid the restaurant in this case because of the threats, we should disregard the logic of the situation. But the point here under consideration involves ethics and public policy as well. It involves the balancing of the interests between liberty and freedom of movement and the restraint thereof. It involves the question as to whether or not the law can afford to encourage bullies to stalk about the land and terrorize citizens by their mere threats. We hesitate to lay down a rule which would do that."

The court concluded that self-defense was not excluded either by defendant's arming himself or by his resort to the cafe, holding that application of the doctrine depended on some act of provocation on his part after his arrival, the alleged "glaring" not being sufficient to constitute such in law. State v Bristol, supra, at page 766. See also Bennett v State, 23 Md 562, 188 A2d 142 (1963); Vincent v State, 153 Ga 278, 112 SE 120 (1922); and State v Flory, 40 Wyo 184, 276 Pac 458 (1929).

So also in Thompson v United States, 155 US 271, 39 L ed 146, 15 S Ct 73 (1894), the Supreme Court concluded that one was not deprived of the right to defend himself either by the fact that, following an altercation with the deceased, he armed himself for protective purposes, or because he returned home by a route which led him again into the deceased's presence. The Court, in finding instructions to the contrary prejudicial, stated, at page 278:

"These instructions could, and naturally would, be understood by the jury as directing them that the accused lost his right of self-defense by returning home by the road that passed by the place where the deceased was, and that they should find that the fact that he had armed himself and returned by that road was evidence from which they should infer that he had gone off and armed himself and returned for the purpose of provoking a difficulty. Certainly the mere fact that the accused used the same road in returning that he had used in going from home would not warrant the inference that his return was with the purpose of provoking an affray, particularly as there was evidence that this road was the proper and convenient one. Nor did the fact that the defendant, in view of the threats that had been made against him, armed himself, justify the jury in inferring that this was with the purpose of attacking the deceased and not of defending himself, especially in view of the testimony that the purpose of the defendant in arming himself was for self-defense."

It is settled law, therefore, that

**193**

one is not *per se* deprived of the right to act in self-defense by the fact that he has armed himself and again sought out his assailant. See also Gourko v United States, 153 US 183, 38 L ed 680, 14 S Ct 806 (1894); Annotation, 18 ALR 1280. The existence of such defense depends upon the factual question of the intent of the accused in returning to the scene and the provocation which he offers the decedent upon again contacting him. State v Bristol, supra. Thus, it has been declared:

". . . Before one can be said to have provoked an attack on conflict, within the rule which precludes the provocator from asserting self-defense as an excuse or justification, he must willingly and knowingly do some act after meeting his antagonist, reasonably calculated to lead to an affray or deadly conflict; unless such act is clearly calculated and intended to have such effect, the right of self-defense is not lost, even though the defendant has armed himself and gone to meet his antagonist for the purpose of a conflict. . . .

"One may, without forfeiting his right to defend himself against attack, seek an interview with another in a peaceable manner, for the purpose of demanding an explanation of offensive words or conduct or demanding the settlement of a claim, and according to many decisions, he need not go in a friendly spirit. He may, it seems, assert self-defense as excuse or justification, even though he arms himself before seeking the interview." [26 Am Jur, Homicide, § 131.]

Applying these well-settled principles to the situation depicted in the record before us, it cannot ▬▬▬▬▬■ be gainsaid it was open to the fact finders to determine that accused, having been violently set upon by Howard, armed himself in light of Howard's threats to harm him *in futuro*, and sought his assailant out for the purpose of reconciling their differences and insuring that he would not be again assaulted, pending his departure from the Base.

**194**

The fact that he took such steps in anticipation of another "razor whipping" when the parties met did not render him an aggressor or guilty of provocation. State v Bristol, supra; Thompson v United States, supra. Such a finding—again, one of fact—would depend on his purpose and his actions after he entered Airman Junior's room, *i.e.,* whether such were intended to, and did reasonably amount to, provoking Howard into a renewal of his earlier conduct in order that the accused might have a pretext on which to take his life. State v Bristol, supra. "One whose acts provoke a situation wherein he has to defend himself, who does so without intending thereby to provoke a difficulty, or who does so without intent to use the provoked assault as a pretext for killing or injury, does not thereby forfeit his right of perfect self-defense." Caraway v State, 98 Tex Crim 119, 263 SW 1063 (1924), at page 1065. We hold the evidence placed in issue the question whether accused acted in self-defense in slaying Red Hoss and that the board of review erred in determining to the contrary. State v Doris, 51 Ore 136, 94 Pac 44 (1908); Gray v State, 55 Tex Crim 90, 114 SW 635 (and Note thereto, 114 SW 648) (1908); King v State, 51 Tex Crim 208, 101 SW 237 (1907); Beard v State, 47 Tex Crim 50, 81 SW 33 (1904); Bonnard v State, 25 Tex App 173, 7 SW 862 (1888); Annotation, 45 LRA 685.

### III

In assessing the evidence, the law officer also concluded that self-defense was in issue, and delivered the following instructions to the members of the court regarding that doctrine:

"The court is further advised that the question of self-defense has been put in issue with respect to the offense here charged and all lesser degrees of homicide. You are advised that the accused is justified if he killed in self-defense. Self-defense is available if he honestly believed on reasonable grounds from all the circumstances as they appeared to him that the killing

was necessary to save his own life or to prevent great bodily harm to himself.

"For the defense of self-defense to be available to the accused, he must not have been the aggressor or intentionally provoked the altercation with the victim. He must have honestly believed on reasonable grounds that the danger of his being killed or of his receiving great bodily harm was imminent.

"If the accused honestly believed that he was in imminent danger of death or great bodily harm and that his only means of avoiding the impending danger consisted in taking the life of his assailant, and under the circumstances as they appeared to him he had reasonable grounds for such belief, the defense of self-defense is available to him even though in fact he may have been mistaken as to the actual existence or imminence of the danger.

"The burden is on the prosecution to establish the accused's guilt by legal and competent evidence beyond a reasonable doubt. Consequently, unless you are satisfied beyond a reasonable doubt that the accused did not act in self-defense, you must find him not guilty of the offense charged or of any lesser included offenses."

The defense requested an initial instruction regarding the effect of accused's intent to use the pistol with which he had armed himself only in a defensive manner as bearing upon the element of premeditation included in the original charge. This matter, of course, is mooted by the court's findings of guilty of unpremeditated murder, and warrants no further discussion. Counsel also asked that the instructions on self-defense include "wherever you deem it appropriate, this sentence; 'That the law does not demand detached reflection from an accused when he is under pressure or involved in a fast moving situation.'" Finally, counsel declared:

"Sir, my purpose of course, for making a request for any instructions is to try to capture what little atmosphere, if any, the defense has created during the trial. If the instructions are not improper in law or if they're not an improper statement of the law, and they do not invade the province of the court as a fact finding body, I think that when a man's life is at stake he should not be denied a few words that might help the court or place the court in a position to better discharge their duties. Of course, we realize it's difficult to personalize instructions but I think in law, as we know, the manual we have been studying from is merely an instructional guide and it is necessary that every effort be made after the evidence has been introduced that the law officer try to personalize or try to instruct, or make whatever changes are necessary to adequately cover all the facts as presented in the case."

The law officer denied the defense request to include the quoted matter in his instructions and to ██ ■ "personalize" the instructions in light of the evidence which had been adduced. The law officer's action was erroneous and, in light of the fact an issue was raised concerning self-defense, prejudicially so.

We do not concern ourselves with the failure to grant the defense request to include in the instructions on self-defense some direct reference to the failure of the law to demand detached reflection on the part of an accused during a fast-moving situation. While we have used similar language, see United States v Regalado, 13 USCMA 480, 484, 33 CMR 12, 16, it is arguable that the law officer embraced the matter in his instructions by requiring the court members to view the situation presented through the eyes of the accused. In any event, it becomes unimportant in the context of this case in light of the law officer's refusal of the accused's final request that he tailor the instructions to the defense

theory, as supported by the evidence adduced in the case.

We have heretofore dealt at length with the need to, in defense counsel's phrase, "personalize" the instructions to the evidence and theories which it supports. We have reiterated the necessity for such instructions in lieu of delineation of abstract statements of the law on several occasions. United States v Acfalle, 12 USCMA 465, 31 CMR 51; United States v Shanks, 12 USCMA 586, 31 CMR 172; United States v Smith, 13 USCMA 471, 33 CMR 3; United States v Jones, 13 USCMA 635, 33 CMR 167. Perhaps the best explanation of the necessity therefor is found in United States v Smith, supra, in which Judge Kilday, for a unanimous Court, summed up our position:

". . . Thus it is required, *inter alia*, that instructions be given at trial not only on the elements of the offense but, in addition, on all issues, defenses, and lesser offenses raised reasonably by the evidence. The court members must be furnished with the law pertinent to the facts developed in order that they may resolve the issues before them. And, of course, an abstract statement of law may not suffice to insure intelligent determination of the questions posed.

"Lest there be room for any uncertainty in the mind of anyone, therefore, we deem it appropriate to elaborate on the sense in which this Court has used the terms 'tailor,' and 'tailoring.' What is contemplated is the affirmative submission of the respective theories, both of the Government and of the accused on trial, to the triers of fact, with lucid guideposts, to the end that they may knowledgeably apply the law to the facts as they find them. A liberal application of this approach will avoid the possible pitfalls that may attend instructing on barren and abstract legal principles in a vacuum. In any case, it surely benefits both parties to a proceeding, and obviously enhances the quest for truth

and justice in a truly enlightened atmosphere."

It is difficult to see how the matter could have been put more plainly. Yet, a request for charging the court members in terms of the evidence and theories presented was here overruled and, as defense counsel noted, the terms of an instructional form book were depended upon, to the exclusion of the effect of the evidence and any explanation of the legal problems involved, as placed in issue by that proof. And the result is, as we warned in United States v Smith, supra, a failure to "avoid the possible pitfalls that may attend instructing on barren and abstract legal principles in a vacuum." We reiterate our determination that meaningful instructions be given in order that the fact finders are not left to prowl unguided among the evidence and, in their deliberations, reach erroneous conclusions concerning the guilt of the accused despite a proper exercise of their function in selecting the facts from among a welter of confusing and conflicting stories told by the various witnesses. True, as defense counsel informed the law officer, the task of tailoring the instructions to the evidence may be difficult, but it is the duty of the military judge; it prevents erroneous verdicts; it "enhances the quest for truth and justice in a truly enlightened atmosphere," United States v Smith, supra; and, as importantly, its absence will surely lead in particular cases, as here, to reversal and remand for another trial, at which such instructions will eventually have to be delivered. We commend, therefore, to the attention of all law officers and the members of the bar the need for application of the principles regarding instructions which we have heretofore laid down, as well as preparation of requested charges which embody them.

Turning to the advice before us, we find the sole reference to accused's appearance at Airman Junior's room, armed with a revolver, and his address to the decedent regarding the latter's razor or the earlier "razor whipping" which he had undergone,

196

was that the defense of self-defense was not available to Moore if he was "the aggressor or intentionally provoked the altercation with the victim." Not a single reference was made to the effect of Moore's arming himself, his return to the room, his purpose in doing so, whether he had the right to demand an explanation of Howard's earlier behavior, to effect a settlement with him of their difficulties, or the bearing of his intent in so acting upon his ability to claim successfully that he acted in self-defense. For aught the record discloses, the fact finders may well have thought it to have been incumbent upon the accused, once he left Howard's presence, to stay out of his way or to seek assistance from the authorities and in no way and for no reason to arm himself and return when it was reasonably apparent that Howard might again attack him. Cf. United States v Green, supra; State v Bristol, supra. Yet, as we have noted above, the fact accused armed himself in light of Howard's alleged threats and returned—according to him—only to seek a peaceful resolution of their quarrel, did not deprive him of the opportunity to exert self-defensive force when he was once again faced with Red Hoss' production of the straight razor and—again, according to accused—a strongly phrased declaration that it would be put to immediate use. See 26 Am Jur, supra, § 131, and cases cited.

In Carter v State, 37 Tex Crim 403, 35 SW 378 (1896), in reversing for the failure of the trial judge to apply the principles of law involved to the evidence in the case, the court declared, at page 379:

". . . This charge contains nothing but abstract propositions of law. There is no attempt to apply these principles, or any of them, directly to the facts of this case. . . . The main question for the decision of the jury is the intention with which the provocation was given, and this should be stated in the charge. In every case involving the question of provoking the difficulty, if the defendant provoked the difficulty or produced the occasion for the purpose of inducing his adversary to make the attack, so that he could kill him, why this is murder. . . . But, unless there is an intention to have a difficulty, his right of self-defense remains complete. Some acts may be committed, of such a character as to carry the intent with them. This, however, is a matter for the jury. The court should, in all cases, submit the intention with which the provocation was given; and the special instructions requested by appellant on this subject should have been given, or something similar."

Winters v State, 37 Tex Crim 582, 40 SW 303 (1897), also involved a situation similar to that now before us. There, an altercation occurred between the defendant and the deceased, in which the deceased was the aggressor, drawing a knife on the defendant and abusing him. On a later occasion, defendant, armed, demanded an apology, and, upon being again abused and assaulted, shot the decedent. The court reversed on the basis of the failure of the trial judge to explain the nature of provocation which might deprive the defendant of his right to utilize self-defense. It said, at page 305:

". . . Appellant's defense was that he accosted the deceased for the purpose of requesting an apology for the ill treatment which he suffered at his hands on the preceding Sunday; that he made such request in a polite and peaceful manner; and that he was then cursed and abused, and immediately assaulted by the deceased, before he did anything; that he only shot when the deceased was in the act of taking his life, or inflicting upon him serious bodily harm, with a deadly weapon; and he had a right to have this matter of defense presented to the jury in a clear charge, untrammeled by any qualification, especially a qualification involving an undefined provocation."

And in Caraway v State, supra,

wherein the jury was instructed the defendant could not avail himself of self-defense if " 'the said Caraway, the defendant, was guilty of acts which provoked the situation requiring him to defend himself,' " the court declared, at page 1065:

"This charge was excepted to from various angles. That it is erroneous is apparent. One whose acts provoke a situation wherein he has to defend himself, who does so without intending thereby to provoke a difficulty, or who does so without intent to use the provoked assault as a pretext for killing or injury, does not thereby forfeit his right of perfect self-defense. The charge quoted is stripped of instruction as to any intent of appellant in the premises. There was no question but that he went to the place where the shooting occurred, carrying his gun, nor of the fact that at said place and while in his own field, but near the home of Will Jackson, he struck Jackson's wife with a stick and almost immediately thereafter appellant and Jackson fired at each other at or about the same time. It thus could easily be seen how hurtful might be the instruction given, unless qualified by the further statement to the effect that in order to forfeit his right of self-defense the defendant must have intended by his acts to provoke such difficulty, which he purposed using as a pretext, etc., and that what he did was reasonably calculated to effect that purpose."

In like manner, it is conceded in this case that the accused, driven by Howard from the latter's room, armed himself and returned to the barracks, seeking out his tormentor—depending upon the evidence—either for the purpose of putting an end to him or in order to settle their differences and insure he was not again placed in danger of death or grievous bodily harm. Yet, not only did the law officer fail to apply the principles which were generally stated in his instructions to the facts of the case, but he wholly failed to give the fact find-

ers any guidance at all in equating the accused's conduct to aggression or provocation of another difficulty or to inform them of the important bearing of his intent and purpose upon his return. They were left to pilot themselves willy-nilly between the broad abstract statements of the law which he did provide and, uninformed as to the effect of the various versions of the incident, reach their own, untutored conclusion as to the effect of accused's behavior *vis a vis* that of Red Hoss. Under the circumstances, we find the failure of the law officer to tailor his instructions to the evidence and to charge the members of the court-martial regarding the law of self-defense as applied to the shooting of Howard to be prejudicially erroneous. Self-defense was in issue, and we cannot say these matters were so self-evident that there is not a fair risk the members were misguided in reaching their conclusion accused was guilty of unpremeditated murder.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Air Force. A rehearing may be ordered.

Judge KILDAY concurs.

QUINN, Chief Judge (dissenting):

I fully recognize and appreciate the logic and the law of the instinct of self-preservation in the face of a murderous attack. United States v Adams, 5 USCMA 563, 18 CMR 187. But this case does not belong in that category. All the evidence points to a calculated effort on the part of the accused to get Red Hoss to draw his razor so the accused could shoot him. As the accused put it, he was " 'no psycho' " and he knew exactly what he was doing. He had not merely an " 'equalizer' " but a devitalizer, which he used immediately and with precision. United States v Green, 13 USCMA 545, 549, 33 CMR 77. Not until he had accomplished what he had so clearly come to do, did he back up an inch; and give voice to the classic words of warning. I agree with the board of review there is insufficient evidence to put in issue the claim of

self-defense. In strikingly similar circumstances this Court has declared:

". . . After the argument had subsided, the accused withdrew to his bunker, armed himself with a weapon and returned to the group carrying the lethal instrument in a position of readiness. Before the victim could make his purpose clear, the accused fired and killed him. These actions speak louder than any words. They are susceptible of but one meaning: that the accused conceived the intent to kill his victim, procured the means, and carried his intention into execution. In terms of legal connotation this is premeditated murder and nothing else." [United States v Black, 3 USCMA 57, 60, 11 CMR 57.]

I would, therefore, affirm the decision of the board of review. United States v Green, supra.