EFFRON, Senior Judge,
with whom ERDMANN, Judge,
joins (dissenting):
Appellant served as a platoon leader in Iraq in 2008 in an area north of Baghdad and Tikrit. The mission of Appellant’s unit included counterinsurgency operations and activities in the Albu Toma area in conjunction with Iraqi forces. On April 21, 2008, a hostile attack featuring an improvised explosive device (IED) killed two members of his platoon. Based upon intelligence information, Appellant interrogated Ali Mansur, a person suspected of involvement in terrorist activities, on May 5, 2008, and on May 16, 2008, in an effort to pinpoint responsibility for the terrorist attack. Two different narratives emerged at trial concerning the May 16 interrogation. The prosecution, based upon witness testimony and forensic evidence, contended that Appellant murdered Ali Mansur, who was unarmed, unclothed, and defenseless. The defense, based primarily on Appellant’s testimony, contended that Ali Mansur suddenly reached for Appellant’s weapon during the interrogation, and Appellant shot Ali Mansur in self-defense.
At trial, the prosecution and the defense each brought to the members’ attention evidence in the record supporting their respective views. The responsibility for determining what actually happened — the crime of murder or justifiable self-defense — rested with the members of the court-martial panel. The responsibility for ensuring that the members made this decision in accordance with the proper legal standards rested with the military judge.
Following the close of the evidence, the military judge offered a variety of instructions regarding the matters at issue, including an instruction on self-defense. The defense objected to the content of the self-defense instruction. The military judge rejected the defense objection, and the members returned a verdict of guilty on the murder charge now under review.
Before our Court, Appellant challenges the content of the instruction, and raises a related issue concerning the failure of the prosecution to provide timely disclosure of evidence favorable to the defense. The majority rejects these challenges based upon the majority’s conclusion that any instructional error was harmless. 71 M.J. 228, 236-37 (C.A.A.F.2012). For the reasons set forth below, I respectfully dissent.
*240 I.SELF-DEFENSE
A. THE DECISIONAL PROCESS IN COURTS-MARTIAL
1. The separate responsibilities of the military judge and the court-martial panel
In trials by court-martial, Congress has vested the responsibility for entering findings — the decision as to whether a service-member is guilty — in the court-martial panel, which performs the function of a jury. See Articles 25, 51, 52, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 825, 851, 852 (2006). To ensure that the panel reaches this determination in accordance with the law, and not on the basis of extraneous or other improper influences, the military judge instructs the panel on the applicable legal standards for reaching the decision on findings. See Article 51(c), UCMJ, 10 U.S.C. § 851(c) (2006); Rule for Courts-Martial (R.C.M.) 920.
2. The requirement to instruct when self-defense is in issue
Among the required instructions, the military judge must instruct the panel on any special defense “in issue,” including self-defense. R.C.M. 920(e)(3); R.C.M. 916(e); United States v. Stanley, 71 M.J. 60, 62 (C.A.A.F.2012) (citing United States v. McDonald, 57 M.J. 18, 20 (C.A.A.F.2002)). The military judge must treat self-defense as in issue when “ ‘some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they chose.’” Stanley, 71 M.J. at 63 (quoting United States v. Lewis, 65 M.J. 85, 87 (C.A.A.F.2007)); see Dep’t of the Army, Pam. 27-9, Legal Services, Military Judges’ Benchbook para. 5-1.a. (Jan. 10, 2010) [hereinafter Military Judges’ Benchbook] (“The credibility of witnesses, including the accused, whose testimony raises a possible affirmative defense, is not a factor in determining whether an instruction is necessary.”).
3. Raising the issue of self-defense
R.C.M. 916(e) sets forth the rules governing self-defense. Under R.C.M. 916(e)(1):
It is a defense to a homicide ... that the accused:
(A) Apprehended, on reasonable grounds, that death or grievous bodily harm was about to be inflicted wrongfully on the accused; and
(B) Believed that the force the accused used was necessary for protection against death or grievous bodily harm.
If the record contains “some evidence” raising the issue of self-defense, the military judge must instruct the members of their responsibility to make the following determinations. First, the court-martial panel must decide whether the accused “had a reasonable belief that death or grievous bodily harm was about to be inflicted on (himself) _” Military Judges’ Benchbook para. 5-2-1. The Benchbook further states: “The test here is whether, under the same facts and circumstances presented in this case, an ordinary, prudent adult person faced with the same situation would have believed that there were grounds to fear immediate death or serious bodily harm.” Id. Second, the court-martial panel must decide whether the accused “actually believed that the amount of force (he) (she) used was required to protect against death or serious bodily harm.” Id. In making that decision, the court-martial panel “must look at the situation through the eyes of the accused.” Id. “In addition to the circumstances known to the accused at the time,” the court-martial panel must consider other factors pertinent to the case as identified by the military judge. Id.

4.The degree of force

The military judge also must instruct the members on how to address the degree of force used by the accused:
As long as the accused actually believed that the amount of force (he) (she) used was necessary to protect against death or grievous bodily harm, the fact that the accused may have used excessive force (or a different type of force than that used by the attacker) does not matter.
Id.; see United States v. Acosta-Vargas, 13 C.M.A. 388, 393, 32 C.M.R. 388, 393 (1962).
Depending on the circumstances, the military judge will instruct the members that:
*241 [t]he accused, under the pressure of a fast moving situation or immediate attack, is not required to pause at (his) (her) peril to evaluate the degree of danger or the amount of force necessary to protect (himself) (herself)- In deciding the issue of self-defense, you must give careful consideration to the violence and rapidity, if any, involved in the incident.
Military Judges’ Benchbook para. 5-2-6.
5. Opportunity to retreat or seek help
Depending on the circumstances, the military judge may be required to instruct the members to take into account whether the accused had an opportunity to withdraw safely or obtain the help of others. See id. The responsibility for deciding whether such factors, in light of the other circumstances, impact the issue of self-defense rests with the court-martial panel. See id.
6. The effect on self-defense when the accused acts as an aggressor, engages in mutual combat, or provokes an attack
Depending on the circumstances, an accused may lose the right to self-defense “if the accused was an aggressor, engaged in mutual combat, or provoked the attack.” R.C.M. 916(e)(4). The military judge must provide appropriate tailored instructions to the court-martial panel if the evidence indicates that the accused may have engaged in such conduct. Lewis, 65 M.J. at 87-89; R.C.M. 920(e)(3). Under the model instructions set forth in the Benchbook, if the evidence raises the issue of loss of self-defense by provocation, the military judge informs the panel that the right of self-defense is not lost unless the provoking act “is clearly calculated and intended by the accused to lead to a fight (or deadly conflict)”. Military Judges’ Benchbook para. 5-2-6.
7. Regaining the right of self-defense
If there is evidence that the adversary of the accused “escalated the level of conflict” and placed the accused “in reasonable apprehension of immediate death or grievous bodily harm,” the accused regains the right of self-defense. Id.; see Lewis, 65 M.J. at 88 (citing United States v. Cardwell, 15 M.J. 124, 126 (C.M.A.1983)). Under the model instructions, if the accused engages in a provoking act or mutual combat involving “force not likely to produce death or grievous bodily harm” and the adversary escalates the conflict so that the accused is placed “in reasonable apprehension of immediate death or grievous bodily harm,” the accused regains the right of self-defense. Military Judges’ Benchbook para. 5-2-6. As our Court noted in United States v. Moore, 15 C.M.A. 187, 198, 35 C.M.R. 159, 170 (1964):
One whose acts provoke a situation wherein he has to defend himself, who does so without intending thereby to provoke a difficulty, or who does so without intent to use the provoked assault as a pretext for killing or injury, does not thereby forfeit his right of perfect self-defense.
Because the underlying concept of self-defense involves protection and not aggression, the military judge is not required to give an escalation instruction when the accused uses deadly force in the midst of a mutual affray to subdue an adversary. See Stanley, 71 M.J. at 64 (concluding that the military judge was not obligated to give such an instruction sua sponte when four disaffected drug traffickers armed with loaded weapons engaged in mutual combat in a chaotic fast-moving situation, and the defense did not present a theory of escalation at trial or request an escalation instruction; and observing that the accused’s use of a loaded firearm to subdue an adversary in that situation constituted the use of deadly force under the particular circumstances of the case). A display of a loaded weapon, however, does not per se constitute use of deadly force. See id. at 63 n. 3.

8.The burden of proof

Where there is some evidence raising the right of self-defense and the related issues involving the opportunity to retreat and the loss of the right of self-defense, the prosecution bears the burden of proving that the accused did not have the right of self-defense. Military Judges’ Benchbook para. 5-2-6. The responsibility of making the determination that the accused had an opportunity *242 to retreat, that the accused lost the right of self-defense, or that the accused did not regain the right of self-defense, rests with the court-martial panel. See id.
B. DISCUSSION
1. Prelude to the shooting
The parties generally agree on the predicate events. During Appellant’s military assignment to the theater of operations in Iraq, his unit engaged in combat activities against hostile forces and suffered losses as the result of terrorist activities in the battlefield environment. Appellant sought to pinpoint responsibility for the attack. Through intelligence channels, he received information pointing to Ali Mansur as a person who could provide information about the attack. The initial interrogation, and a subsequent interrogation by other officials, did not produce useful information about the attack. During the initial interrogation, on May 5, 2008, Appellant used his helmet to strike Ali Mansur on the back, an act that resulted in his conviction for assault. The validity of that conviction is not at issue in the present appeal.
On May 16, 2008, after receiving orders to return Ali Mansur to his village, Appellant, who was accompanied by a noncommissioned officer (NCO) and an interpreter, decided on his own initiative to undertake a further interrogation of Ali Mansur en route in an isolated culvert. He did so even though it involved a deviation from the order he had received to return Ali Mansur to his village. Appellant did not have training or responsibilities as an interrogator. The interrogation techniques Appellant used included removing Ali Mansur’s clothing, ordering him to sit, pointing a loaded weapon at Ali Mansur, and threatening to kill him if he did not provide the requested information. Appellant acknowledged that in doing so, he used unauthorized interrogation methods.
2. The two narratives
At trial, two different versions emerged as to what next occurred on May 16, 2008. The prosecution, relying primarily on the testimony of the interpreter, the NCO, and forensic evidence, sought to convince the court-martial panel that Appellant took Ali Mansur to the culvert in order to kill him, and that he did so. Neither the interpreter nor the NCO had a complete view of the events that immediately preceded the shooting, and the prosecution relied on other evidence, primarily the testimony of the pathologist who performed the autopsy, in an effort to convince the members that Appellant had engaged in an execution-style shooting of a defenseless person.
Appellant, in his testimony, acknowledged that he was not a trained interrogator, that he employed unauthorized interrogation techniques, and that he should not have done so. He stated that he used these techniques in an effort to extract information from Ali Mansur, and that he had no intent to kill him. Appellant testified that during the interrogation, he heard the sound of concrete hitting concrete over his shoulder. Appellant further testified that he saw Ali Mansur stand up from the sitting position and reach for Appellant’s weapon; and at that point, in self-defense, Appellant shot Ali Mansur.

3.The limited focus on the unauthorized interrogation techniques

With respect to the unauthorized techniques in the culvert on May 16, 2008, the Government did not charge Appellant with criminal violation of a specific order or regulation, maltreatment of a detainee, simple assault, or assault with a dangerous weapon, see Articles 92, 93, 128, UCMJ, 10 U.S.C. §§ 892, 893, 928 (2006); nor did the Government ask the military judge to find that the interrogation techniques amounted to any of those offenses as a basis for addressing the issue of self-defense.
The Government did not ask the military judge to conclude that the interrogation techniques constituted the use of deadly force for purposes of precluding Appellant from asserting the right of self-defense; nor did the Government ask the military judge to instruct the members on whether there was an opportunity to retreat or seek help from others. The military judge did not conclude, *243 as a matter of law or fact, that Appellant’s interrogation techniques constituted the use of deadly force or that Appellant’s conduct otherwise precluded a self-defense instruction. Instead, the military judge recognized that self-defense was in issue. In that regard, there was “some evidence” in the record, primarily from Appellant’s testimony, that he used the interrogation techniques for purposes of extracting information, and not for purposes of using deadly force to kill Ali Mansur; that Ali Mansur rose from his sitting position and reached for Appellant’s weapon; and that, in a fast-moving scenario, and fearing that Ali Mansur might try to turn the pistol against him, Appellant shot Ali Mansur in self-defense. In that context, providing the members with a self-defense instruction was necessary to ensure that the decision as to what actually transpired in the culvert would be properly made by the court-martial panel.

4.The instructions provided by the military judge

The issue before us is whether the military judge, in the course of providing instructions on self-defense, correctly advised the members on how to address the issue of whether, based on their assessment of the facts, Appellant lost the right of self-defense. In that regard, the granted issue does not call upon us to decide whether Appellant is, in fact, guilty of the act of murder. The granted issue requires us to determine whether the court-martial panel received instructions from the military judge on the issue of self-defense that properly informed the members as to the determinations they would need to make during the panel’s deliberations on the issue of guilt or innocence.
The military judge sought to address the issue of provocation through the following instruction:
Now there exists evidence in this case that the accused may have been assaulting Ali Mansur immediately prior to the shooting by pointing a loaded weapon at him. A person who without provocation or other legal justification or excuse assaults another person is not entitled to self-defense unless the person being assaulted escalates the level of force beyond that which was originally used. The burden of proof on this issue is on the prosecution. If you are convinced beyond a reasonable doubt that the accused, without provocation or other legal justification or excuse, assaulted Ali Mansur then you have found that the accused gave up the right to self-defense. However, if you have a reasonable doubt that the accused assaulted Ali Mansur, was provoked by Ali Mansur, or had some other legal justification or excuse, and you are not convinced beyond a reasonable doubt that Ali Mansur did not escalate the level of force, then you must conclude that the accused had the right to self-defense, and then you must determine if the accused actually did act in self-defense.
The defense objected, arguing that Appellant’s conduct did not constitute the offense of assault. The military judge overruled that objection.
As noted in the majority opinion, the last sentence of the instruction is problematic. It sets forth six different determinations for the members to make, employs two different tests for the members to apply, and includes a confusing double-negative. The instruction asked the members to make the following six determinations, with little or no guidance as to the critical standards applicable to each:
1. Did Appellant assault Ali Mansur?
2. Was Appellant provoked by Ali Man-sur?
3. Did Appellant have some legal justification or excuse?
4. Did Ali Mansur escalate the level of force?
5. Did Appellant have the right to self-defense?
6. Did Appellant act in self-defense?
The instruction contains two different tests— no reasonable doubt and beyond a reasonable doubt — without clear linkage to the separate determinations. The confusing double-negative asked the members to determine whether “you are not convinced beyond a reasonable doubt that [Ali Mansur] did not escalate the level of force.”
*244 The record reflects the difficulty the members faced in comprehending and applying the instruction at issue. Before the members closed to deliberate, one of the members asked how an assault with a weapon nullifies a self-defense argument. In response, the military judge read for a second time the entire instruction on self-defense, without specifically addressing the member’s question. In addition, one of the members asked for a printed copy of all of the instructions, a request that the military judge denied.
The instruction failed to provide the panel with any guidance as to whether Appellant had the opportunity to withdraw or seek help; nor did it provide the panel with any guidance on how to determine whether Appellant’s unauthorized interrogation: (1) constituted an assault as a matter of law; and (2) whether such conduct, if an assault, also constituted the use of deadly force for purposes of depriving Appellant of the right of self-defense.
The ambiguous wording of the instruction created the potential for the members to interpret it as requiring the panel to conclude that self-defense would not apply unless the evidence demonstrated each of the following: (1) an absence of assault; and (2) an escalation by the victim. Such an interpretation — fairly implied from the text of the instruction but an incorrect statement of the law — created a fair risk of prejudice. The instruction, compromising the right of Appellant to have the issue of self-defense decided by a properly instructed court-martial panel, constituted prejudicial error. Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2006).
The majority opinion holds that any error was not prejudicial because no reasonable court-martial panel could have concluded that Appellant acted in self-defense. 71 M.J. at 236-37. Under the majority view, Appellant did not have the right to defend himself, notwithstanding evidence that a person suspected of supporting the enemy rose up and reached for Appellant’s weapon during an interrogation. The majority takes the position that Appellant, by virtue of conducting an unauthorized interrogation that used improper techniques, including pointing a pistol at the suspect and using threatening words, did not have the right to defend himself when his life was threatened. 71 M.J. at 235-37.
I respectfully disagree with the majority’s conclusion on the question of prejudice. The evidence at trial established an issue of self-defense for resolution by the court-martial panel, not this Court. The evidence at trial included testimony that: (1) the events occurred during an interrogation of a person suspected of aiding enemy forces; (2) the interrogation sought to obtain information for use in the combat theater of operations; (3) Appellant removed the suspect’s clothing, pointed a pistol at the suspect, and used threatening language for the purpose of obtaining useful information; and (4) Appellant had no intent to use deadly force against the suspect. Given the contested nature of this evidence at trial, the responsibility for deciding what occurred, and whether Appellant acted in self-defense, rested with a properly instructed court-martial panel. See supra Part I.A.
Under the majority’s approach, the panel should not have had the opportunity to consider factual issues raised by Appellant’s testimony, including whether the interrogation techniques amounted to the use of force likely to produce death or grievous bodily harm, whether Appellant intended to use the interrogation techniques as a pretext for killing Ali Mansur, or whether Appellant reasonably apprehended that Ali Mansur rose up and reached for Appellant’s weapon for the purpose of killing Appellant. These issues, however, were matters for resolution by a court-martial panel, not this Court. See supra Part I.A.
If the Government accuses a member of the armed forces of conducting an improper and abusive interrogation, the UCMJ provides ample authority to hold that person accountable in a court-martial. See supra Part I.B.3. Such accountability, however, does not require the servicemember to sacrifice the right of self-defense; nor does it deprive the servicemember of the right to have the panel decide whether, as a matter of fact, the circumstances justified the use of *245 force to save the servicemember’s life from an attack by a person suspected of supporting the enemy.
II. DISCLOSURE OF EXCULPATORY EVIDENCE
Issue II addresses the Government’s obligation to provide timely disclosure of exculpatory information to the defense. The information at issue had a direct bearing on Appellant’s view of the case — that he acted in justifiable self-defense. The majority concludes that any failure by the Government to disclose exculpatory information to Appellant in a timely manner did not prejudice Appellant. The majority relies primarily on the views set forth in the majority’s discussion of Issue I, in which it concludes that any error with respect to the question of self-defense did not prejudice Appellant. In the majority’s view, the question of self-defense had no decisional significance in the case, rendering harmless any error in the disclosure of exculpatory information. I respectfully disagree.
A. TRIAL PROCEEDINGS
The prosecution retained at Government expense a highly respected authority in forensic evidence, Dr. Herbert MaeDonell, as an expert consultant and possible expert witness. During trial, the Government rested its case without calling Dr. MaeDonell to testify, but continued to rely on him as an expert consultant during the presentation of the defense case, including the testimony of Appellant and the forensic experts called by the defense.
On Wednesday, February 25, 2009, Dr. Paul Radelat and Mr. Tom Bevel testified as expert witnesses for the defense and offered their opinions on the forensic evidence. They opined that the evidence indicated that Ali Mansur had been shot while standing, with the first shot to the chest and the second shot to the head. That testimony had great significance for the defense, as it provided scientific support for the defense theory of the ease. In particular, that testimony tended to refute the Government’s theory that Appellant shot Ali Mansur while he was sitting, and it tended to support the defense theory that Ali Mansur was in an upright position, moving towards Appellant’s weapon, when Appellant shot him in self-defense.
Consistent with the standard practice for expert consultants and potential expert witnesses, Dr. MaeDonell sat in the courtroom and listened to the testimony of the defense experts. See M.R.E. 703. After observing the testimony of the defense witnesses, Dr. MaeDonell met with another Government consultant, Dr. Berg, and the three prosecutors to discuss strategy and possible rebuttal.
The military judge later found that during this meeting, Dr. MaeDonell “theorized and demonstrated that an unlikely but possible scenario, that was not inconsistent with the forensic evidence and the only logical explanation consistent with the testimony of Dr. Radelat and Mr. Bevel” was that Ali Mansur was shot first in the chest and second in the head. The military judge also found that “[t]his theory was not inconsistent with the forensic evidence, but was inconsistent with all other evidence known to the Government counsel and Dr. MaeDonell.” At this point, Appellant had not yet taken the witness stand.
On Thursday, February 26, 2009, Appellant testified that as Ali Mansur stood up and reached for his pistol, Appellant shot him twice. Again, Dr. MaeDonell was in the courtroom in his capacity as a Government expert. After hearing Appellant’s testimony, Dr. MaeDonell told Dr. Berg, “That’s exactly what I told you yesterday.” Late Thursday afternoon, the prosecution released Dr. Mae-Donell, who had requested permission to depart. As he left the courtroom, Dr. MaeDo-nell approached the lead civilian defense counsel and said, “I would have made a great witness for you,” or words to that effect. When asked what he meant by that, Dr. MaeDonell responded that he couldn’t comment because he was hired by the Government.
On Friday morning, February 27, 2009, the defense counsel approached the trial counsel, told her about the encounter with Dr. Mae-Donell, and asked her to explain what Dr. MaeDonell meant by his remark. The trial counsel said she did not know, and that she *246 was unaware of any exculpatory information. Neither party took any further action at that point, and the case proceeded to the announcement of findings Friday evening.
In the evening, trial counsel received an email sent by Dr. MacDonell earlier that afternoon, which included Dr. MacDonell’s observation that he was “concerned that I did not testify and have a chance to inform the court of the only logical explanation for this shooting,” namely that Ali Mansur was standing when shot. (Emphasis added.) The trial counsel immediately forwarded it to the defense counsel on Friday night. The military judge also received a copy that night after the findings were announced.
On Saturday morning, February 28, 2009, the defense moved for a mistrial based upon the Government’s failure to disclose Dr. Mac-Donell’s opinion in a timely manner. The military judge heard testimony on the motion from Dr. MacDonell and accepted an oral stipulation of fact as to the conversation between the defense counsel and the trial counsel. Neither side offered additional testimony, but both the defense counsel and the trial counsel proffered their recollection of the events. Ultimately, the military judge denied the motion for a mistrial. He found that “[tjhere is only one reasonable interpretation of Dr. MacDonell’s statement, in light of his area of expertise i.e., that he would have testified that in his opinion the forensic evidence in some way favorably supported the Defense theory of the case.” He also concluded that Dr. MacDonell’s statement to the defense that he would have made a good defense witness was sufficient notice that he possessed favorable information under both Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and R.C.M. 701.
The military judge, however, did not focus his inquiry on whether the trial counsel erred by not sooner exploring this issue with Dr. MacDonell. Instead, the military judge expressed concern as to whether the defense counsel were ineffective, as a matter of law, in not conducting their own exploration of Dr. MacDonell’s comment. The military judge concluded that, even if the defense team was deficient, there was no prejudice given the strong evidence supporting the murder conviction.
B. DISCUSSION
An accused is entitled to “a meaningful opportunity to present a complete defense.” California v. Trombetta, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). To aid the defense counsel in doing so, the government must disclose evidence that is material and favorable to the defense. Brady, 373 U.S. at 87, 83 S.Ct. 1194; R.C.M. 701. Before trial, the defense made a specific request for the disclosure of all exculpatory evidence. In the present case, the Government bears the burden of proving, as a matter of law, that nondisclosure in response to a specific request is harmless beyond a reasonable doubt. United States v. Webb, 66 M.J. 89, 92 (C.A.A.F.2008).
In view of the prosecution’s disclosure of Dr. MacDonell’s e-mail after the return of findings, the issue before us involves the timing of the disclosure. Specifically, whether the disclosure to the defense on Friday night, after the return of findings, constituted timely disclosure in view of the prosecution’s awareness of Dr. MacDonell’s views prior to the return of findings.
As noted by the United States Court of Appeals for the Second Circuit in Leka v. Portuondo, 257 F.3d 89, 100 (2d Cir.2001) (citations omitted):
It is not feasible or desirable to specify the extent or timing of disclosure Brady and its progeny require, except in terms of the sufficiency, under the circumstances, of the defense’s opportunity to use the evidence when disclosure is made. Thus disclosure prior to trial is not mandated. Indeed, Brady requires disclosure of information that the prosecution acquires during the trial itself, or even afterward.
... At the same time, however, the longer the prosecution withholds information, ... the less opportunity there is for use.
The comments by Dr. MacDonell to the trial counsel on Wednesday afternoon placed trial counsel on notice that Dr. MacDonell held an opinion favorable to the defense that she had a duty to promptly disclose. Irre *247 spective of the duty on Wednesday afternoon, when the defense counsel approached the trial counsel and questioned her about Dr. MacDonell’s startling statement that he would have made a good defense witness, the trial counsel at that point had a duty to contact Dr. MacDonell, to inquire promptly into the meaning of that statement, and to disclose the information to the defense team as soon as possible.
In denying the motion for a mistrial, the military judge concluded that even if the defense had sought to put Dr. MacDonell on the stand to offer his opinions, he would have ruled that testimony inadmissible. The military judge set forth two reasons for that conclusion. First, Dr. MacDonell’s opinion of the value of the forensic evidence never really changed. Second, any “revised” opinion was not based on any reassessment of the evidence but merely reflected his evaluation of Appellant’s credibility. The Court of Criminal Appeals held that the military judge would not have abused his discretion in precluding that testimony. United, States v. Behenna, 70 M.J. 521, 530 (A.Ct.Crim.App. 2011). Even if the testimony had been admitted, the lower court concluded that the outcome of the trial would not have changed in view of the Government’s overwhelming evidence of guilt. Id.
The issue of whether Dr. MaeDonell’s opinion was changed or revised has no bearing on the duty to disclose. The information was favorable to the defense. As noted by the military judge, the “only ... reasonable interpretation of Dr. MacDonell’s statement ... favorably supported the Defense theory of the case.” The fact that Dr. MacDonell came to that view after considering the facts, data, and testimony presented during the court-martial underscores the importance of timely disclosure. See R.C.M. 703; United States v. Houser, 36 M.J. 392, 399 (C.M.A. 1993).
The record demonstrates that Dr. MacDo-nell’s potential testimony setting forth his expert views was not confined to a mere belief in the credibility of Appellant’s testimony. He would have provided the court-martial panel with detailed, expert testimony, supplementing the information that had been provided by the two defense experts, from the perspective of a Government-employed consultant of considerable reputation. See United States v. Mustafa, 22 M.J. 165, 166 (C.M.A.1986) (describing Dr. MacDonell as the “preeminent practitioner in the field”).
The Government’s theory of the case, as articulated immediately prior to closing of the trial for deliberation on findings, underscores the prejudice to Appellant stemming from the failure to provide timely disclosure of Dr. MacDonell’s opinion. The prosecution’s closing argument sought to assure the members that the testimony from the defense experts had little worth because they simply set forth possibilities instead of a definite opinion based upon the forensic evidence. Had Dr. MacDonell been called to testify by the defense, it is reasonably foreseeable that he would have added further information from an important perspective, beyond the testimony of the defense experts, based upon his expertise in blood spatter analysis.
III. CONCLUSION
A death occurred in the theater of operations. A soldier has been convicted of murder. Was it murder or self-defense? By law, the responsibility for making that factual determination rested with the court-martial panel, not with this Court. The ambiguous, confusing, and incorrect instructions from the military judge deprived Appellant of the right to have a panel of officers make that decision. The military judge compounded that error by failing to take corrective action with respect to the Government’s failure to provide timely disclosure of exculpatory evidence. This Court should reverse the decision of the Court of Criminal Appeals and authorize a rehearing.